Suzanne GERMANY, Plaintiff, Appellee,

v.

Carol VANCE, et al.,
Defendants, Appellants.

Suzanne GERMANY,
Plaintiff, Appellant,

v.

Carol VANCE, et al.,
Defendants, Appellees.

Nos. 88–1578, 88–1579.

United States Court of Appeals,
First Circuit.

Heard Dec. 8, 1988.

Decided Feb. 14, 1989.

As Amended Feb. 24, 1989.

Rehearing Denied March 20, 1989.

**11**

ers under 42 U.S.C. § 1983 (1982). The Supreme Court has ruled, however, that merely *negligent* actions or omissions by state officials do not "deprive" a person of life, liberty, or property within the meaning of the Fourteenth Amendment, and thus are not actionable under section 1983. *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986). Because the conduct here in question may have been negligent rather than intentional or reckless, we vacate and remand for further proceedings.

Evidence below indicated that employees of the Massachusetts Department of Youth Services ("DYS") were told by plaintiff's parents that the parents had fabricated the assault and battery charge which had caused their teenage daughter to be placed in DYS custody. The parents' statement thus raised the likelihood that the girl had been adjudicated a delinquent on the basis of trumped up testimony. Nonetheless, the DYS employees did not convey what they had learned either to the girl herself or to the state court which had adjudged her a delinquent child. As a result, the girl may have remained in DYS custody—or in particular custodial facilities—for a longer period than she would have, had the parents' statement been promptly relayed to her or to the court.

■ The court below awarded partial summary judgment in favor of the girl on the issue of the employees' liability, ruling that the DYS employees' conduct had, as a matter of law, interfered with the girl's constitutional right of access to the courts. A jury then found that the employees' conduct had harmed the girl and awarded her $40,000 in compensatory damages against them. In reviewing these proceedings, we must confront an issue not addressed by the district court: whether the DYS employees' conduct was "merely negligent"—rather than "intentional" or "reckless"—in which case it could not have caused an unconstitutional deprivation of liberty.[1]

Steven B. Rosenthal, with whom Bornstein & Rosenthal, Boston, Mass., was on brief, for plaintiff, appellee.

Michelle A. Kaczynski, Asst. Atty. Gen., Civ. Bureau, Torts Div., with whom James M. Shannon, Atty. Gen., Boston, Mass., was on brief for defendants, appellants.

Before CAMPBELL, Chief Judge, BOWNES and TORRUELLA, Circuit Judges.

LEVIN H. CAMPBELL, Chief Judge.

■ It can be a deprivation "of life, liberty, or property, without due process of law," in violation of the Fourteenth Amendment, for state officials to deny a person "access to the courts." *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). At issue in this appeal is whether state caseworkers unconstitutionally denied court access to a juvenile offender committed to their care. The district court so held, imposing liability upon the casework-

1. Defendants did not emphasize this argument in their brief to us, and it is not clear whether they raised the argument before the district court. But because it involves so basic an issue of constitutional law—involving the imposition of section 1983 liability on state employees for

We conclude that defendants' conduct, while most certainly regrettable, could not be found, *as a matter of law on summary judgment,* to be intentional or reckless, rather than merely negligent.[2] Thus, the court erred in ruling, as it did, that the employees were summarily liable for an unconstitutional deprivation of plaintiff's rights. We therefore reverse the summary judgment for plaintiff and remand for further consideration of defendants' liability.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The district court outlined the facts of the case in its memorandum and order awarding partial summary judgment to plaintiff. *Germany v. Vance,* 673 F.Supp. 1143, 1145 (D.Mass.1987). This version was based upon the parties' statement of agreed upon facts and on exhibits and affidavits submitted by the parties. In the following summary, we rely primarily on the district court statement.

On September 17, 1979, plaintiff Suzanne Hussey Germany, then 16 years old, was charged with assault and battery upon her father, Michael Hussey. After a juvenile trial in the Woburn District Court, at which plaintiff's father testified in support of the charge, she was found delinquent and was committed to the custody of DYS.[3] Plaintiff appealed from the judgment to a jury of six in the Lowell District Court, where she pleaded delinquent to the charge of assault and battery. Under the terms of an agreed upon disposition, she was given a suspended sentence in the custody of DYS, with probation. On March 11, 1980, after a suspension hearing, her probation was revoked, and she was surrendered to DYS custody. At that time, defendants Carol Vance, a DYS caseworker, and John Paladino, a DYS case manager and Vance's supervisor, were assigned by DYS to supervise plaintiff's care, treatment, and housing.

On March 25, 1980, in the course of a meeting between plaintiff's parents and defendant Vance, plaintiff's mother told Vance that the alleged assault and battery by plaintiff on her father had never taken place. The mother said that the father had lied about the assault in order to obtain DYS services for his daughter. Plaintiff's father was present and did not deny that he had lied. Defendants later stipulated that the statement was made by plaintiff's "parents," because the father, by his silence, had in effect adopted it. Vance mentioned the parents' statement in a report that she prepared on or before April 2, 1980, and submitted to Paladino. Vance and Paladino subsequently discussed the parents' statement with one another.

Neither Vance nor Paladino told plaintiff of her parents' statement. On April 18, 1980, Paladino submitted a report about plaintiff to the Woburn District Court, but did not mention the parents' statement. In May 1980, plaintiff's mother again told Vance that the assault and battery charge had been fabricated. While plaintiff was under the supervision of Vance and Paladino, she was never actually incarcerated; during this period she lived in a foster home, her parents' home, and a friend's home.

On June 9, 1980, because the legal residence of plaintiff's parents had changed, responsibility for plaintiff's case was trans-

arguably negligent conduct—we hold that it belongs to the very small category of important issues that should be reviewed on appeal notwithstanding the failure of the parties to raise it properly below. *See United States v. Krynicki,* 689 F.2d 289, 291 (1st Cir.1982) (noting that in exceptional cases an appellate court will review questions of law neither pressed nor decided below) (citing *United States v. Miller,* 636 F.2d 850, 853 (1st Cir.1980)).

**2.** In characterizing defendants' conduct as "merely negligent," we do not mean to condone it. To the contrary, it seems to have reflected a serious, if non-malicious, professional misjudgment. We use the phrase "merely negligent" only for the purpose of distinguishing negligent conduct, which cannot constitute a violation of the due process clause, from "intentional" or "reckless" conduct, which can constitute such a violation.

**3.** Under Massachusetts law, a minor found to have violated the criminal law is ordinarily not convicted and sentenced like an adult criminal but may instead be adjudicated a delinquent and committed to the custody of DYS. *See* Mass.Gen. Laws ch. 119, § 58 (1984).

ferred from Vance and Paladino to DYS employees in another region, Mark Mulcahy and James Donadini, Jr. Shortly before the transfer, copies of all material concerning plaintiff's commitment and treatment were forwarded to caseworker Mulcahy. Upon reading this material, Mulcahy learned of the parents' statement that the charges against plaintiff had been fabricated. Mulcahy immediately notified his supervisor, Donadini. On the day of the transfer, Mulcahy told plaintiff of her parents' statement. At a meeting on June 9, 1980, Donadini told plaintiff that "anything which can be done to help the situation" would be done.

Plaintiff remained in DYS custody. Within a few weeks, she wrote a letter to Judge Cullen of the Woburn District Court informing him of the allegedly fabricated testimony, but she apparently received no reply. On October 1, 1980, Donadini sent a letter informing Judge Cullen that plaintiff's parents had admitted that the charges had been falsified. Upon receipt of Donadini's letter, Judge Cullen appointed counsel for plaintiff. On November 13, 1980, plaintiff was placed in an independent living situation. She was discharged from DYS custody on September 1, 1981, shortly after her 18th birthday.

Plaintiff brought this section 1983 action against Vance, Paladino, Mulcahy, and Donadini, alleging, among other things, that they had deprived her of her constitutional right of access to the courts.[4] The court below awarded partial summary judgment on the issue of liability in favor of plaintiff against defendants Vance and Paladino. The district court held that the statement of agreed upon facts, affidavits, and exhibits established, as a matter of law, that defendants Vance and Paladino, by failing to inform plaintiff of her parents' potentially exculpatory statement, had violated plaintiff's constitutional right of access to the courts. See Bounds v. Smith, 430 U.S. 817, 821, 97 S.Ct. 1491, 1494, 52 L.Ed.2d 72 (1977). The district court also ruled that the right of access to the courts had been

"clearly established" by 1980, the time of defendants' conduct in question, and so defendants were not entitled to qualified immunity. See Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The case against Vance and Paladino was set for a jury trial on damages. The district court awarded summary judgment in favor of Mulcahy and Donadini, holding that they had "promptly relayed the evidence of recantation to the plaintiff, thereby fulfilling their constitutional duty." 673 F.Supp. at 1148.

A two-day trial on damages was held, which included testimony by plaintiff and by defendants Vance and Paladino. The plaintiff also presented testimony by a clinical psychologist who had examined plaintiff shortly before the trial and who stated that defendants' failure to report promptly the parents' statement to plaintiff had caused her considerable psychological harm. The district court submitted to the jury the task of assessing compensatory damages. The district court denied plaintiff's request to instruct the jury that it could also award punitive damages, holding that plaintiff had not shown the required element of recklessness.

The jury proceeded to award plaintiff $40,000 in compensatory damages. Following the verdict, the district court denied defendants' motion for judgment notwithstanding the verdict or for a new trial. The district court also denied defendants' post-trial motions to alter or amend the partial summary judgment holding them liable as well as their renewed cross-motion for summary judgment in their favor.

On appeal, defendants call for a reversal of the summary judgment on liability and for summary judgment in their own favor. In the alternative, defendants ask for a judgment notwithstanding the verdict on damages or, failing that, a new trial on damages. Plaintiff cross-appeals on two grounds. First, she asks for a reversal of the summary judgment on liability in favor of Donadini. Second, she asks for a reversal of the district court's decision not to instruct the jury on punitive damages.

---

4. Plaintiff also claimed that defendants had deprived her of her right to counsel and of her right to be free from unreasonable seizures.

The district court dismissed these claims, 673 F.Supp. at 1147, and plaintiff does not renew them in her appeal to us.

## II. THE RIGHT OF ACCESS TO THE COURTS

The district court awarded partial summary judgment on liability to plaintiff, on the ground that defendants Vance and Paladino had, as a matter of law, denied plaintiff's "constitutional right of access to the courts." *Bounds v. Smith*, 430 U.S. 817, 821, 97 S.Ct. 1491, 1494, 52 L.Ed.2d 72 (1977).[5] The court noted that a recantation by the principal witness against the plaintiff (her father) would have been grounds for plaintiff, notwithstanding her plea of delinquent, to make a motion for a new trial in the state district court. By failing to provide plaintiff with information about the "recantation," defendants deprived plaintiff of her ability to make such a motion—and, therefore, of her right of access to the courts.[6]

As the district court has noted, the Supreme Court "emphasized that the states have an *affirmative* obligation to assure that inmates have meaningful access to the courts." *Germany*, 673 F.Supp. at 1149 (emphasis in original). *See Bounds v. Smith*, 430 U.S. at 824, 97 S.Ct. at 1496. Thus, in *Bounds*, the Supreme Court held that the Constitution requires that adequate law libraries or other legal assistance be made available to prisoners. More generally, the Court has "struck down restrictions and required remedial measures to insure that inmate access to the courts is adequate, effective, and meaningful." *Id.* at 822, 97 S.Ct. at 1495.

In the district court's view,

It should have been clear to any official under the circumstances presented by this case that withholding from plaintiff the evidence that her father had recanted his testimony would deny her "meaningful access" to the courts. *See Bounds v. Smith*.... The Supreme Court illustrated the constitutional importance of a prison law library by noting that a prisoner must "know what the law is in order to determine whether a colorable claim exists...." *Bounds v. Smith*, 430 U.S. at 825 [97 S.Ct. at 1496].... An individual certainly has at least as strong a need to know the key facts of his or her case in order to determine whether a colorable claim exists. Indeed, failure to disclose facts which are essential to an incarcerated [7] individual's claim for relief may be more effective in denying access to the courts than destroying court papers or limiting access to the mail.

*Germany v. Vance*, 673 F.Supp. at 1149 (footnote omitted). The district court noted that defendants' "personal opinions as to the truth or falsity of the recantation" were beside the point:

It was not for the defendants to determine the strength of plaintiff's claim. Once a principal witness had recanted his testimony, plaintiff had a right to present her case to a judge, whether or not she would ultimately prevail in her motion.

*Id.* at 1148 n. 2.

▇ We agree with the district court that it would be an unconstitutional depri-

5. Our discussion in this part and part III focuses on defendants Vance and Paladino. We deal specifically with defendant Donadini in part IV, at page 21, *infra*.

6. It is not, in fact, clear that the father had "recanted" his testimony. To "recant," as defined in Black's Law Dictionary, is "[t]o withdraw or repudiate formally and publicly." The statement by plaintiff's mother, in front of the father, that the charge had been falsified was made in conversation with Vance, not in any formal proceeding. Nevertheless, the statement was obviously strong evidence that the assault and battery charge had been trumped up, and certainly provided grounds to inquire into the earlier delinquency finding.

7. As noted above, plaintiff was not in fact "incarcerated" during the time that she was under the supervision of Vance and Paladino. During that period she lived at a foster home, her parents' home, and a friend's home. However, she was at all times in DYS custody pursuant to an adjudication of delinquency resulting from the purported assault on her father. A person in such a status undoubtedly has a right of access to the courts for the redress of any injustice in the proceedings leading to her adjudication as delinquent and commitment to DYS custody.

vation of life, liberty or property for a caseworker having charge of a juvenile offender in DYS custody to withhold important exculpatory information—*provided,* however, that the withholding was intentional or recklessly indifferent. *See infra.* It is true that most of the cases involving the right of access involve situations that are factually dissimilar to the one at hand, regarding inmates' opportunities to prepare, to possess, and to send legal papers. *See Simmons v. Dickhaut,* 804 F.2d 182, 183–84 (1st Cir.1986) (collecting cases). Nevertheless, the underlying right recognized by the Supreme Court, as well as by many lower courts, involves not simply a right of prisoners to prepare and dispatch papers but a more general right of prisoners and criminal defendants to have access to the courts that is "adequate, effective, and meaningful." *Bounds,* 430 U.S. at 822, 97 S.Ct. at 1495. In at least two cases, appellate courts have found that a state official who intentionally withholds evidence that would enable an individual to prove a claim in court violates the individual's constitutional right of access. *See Bell v. City of Milwaukee,* 746 F.2d 1205, 1260–63 (7th Cir.1984); *Ryland v. Shapiro,* 708 F.2d 967, 971–75 (5th Cir.1983).[8]

■ To be sure, if the present potentially exculpatory information had come to the attention of a state employee having a less responsible relationship to plaintiff, the question would arise as to whether that employee had any duty to convey the information to plaintiff or to the courts. But we think that Vance and Paladino had the requisite duty to look out for plaintiff's interests in this regard. We have said that

if the state takes a person into custody or otherwise assumes responsibility for that person's welfare, a "special relationship" may be created in respect of that person, and the fourteenth amendment imposes a concomitant duty on the state to assume some measure of responsibility for the person's safety and well-being.

*Estate of Gilmore v. Buckley,* 787 F.2d 714, 721 (1st Cir.), *cert. denied,* 479 U.S. 882, 107 S.Ct. 270, 93 L.Ed.2d 247 (1986). *See also Fox v. Custis,* 712 F.2d 84, 88 (4th Cir.1983) (collecting cases regarding the state's duty to protect people in the state's custody). *See generally* Note, *Actionable Inaction: Section 1983 Liability for Failure to Act,* 53 U.Chi.L.Rev. 1048 (1986). In the present case, the DYS's custodial responsibility for plaintiff was being discharged by Vance, plaintiff's caseworker, and Paladino, Vance's immediate supervisor. As plaintiff's officially assigned DYS workers, defendants had the sort of "special relationship" with plaintiff that would give them, in appropriate circumstances, a duty to take affirmative steps to ensure plaintiff's continuing right of access to the courts. The fact that plaintiff was a minor could only serve to heighten this responsibility.

Because of this special relationship, the present case is easily distinguishable from *Kompare v. Stein,* 801 F.2d 883 (7th Cir. 1986), cited by defendants in support of their contention that they were not constitutionally obligated to inform plaintiff of the potentially exculpatory information that they had received. In *Kompare,* the court held that a medical examiner did not violate any constitutional duty to a criminal defendant by not revealing exculpatory information to the grand jury and prosecutor. But the medical examiner lacked the sort of "special relationship" with a criminal defendant that DYS workers have with a juvenile under their direct supervision. That the medical examiner was held to have had no constitutional duty to reveal the exculpatory information is not determinative of the duty in this case. Other cases cited by defendants involving officials' alleged failures to investigate claims of innocence, *Baker v. McCollan,* 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979); *Lopez v. Ruhl,* 584 F.Supp. 639 (W.D.Mich.1984), are likewise inapposite. Plaintiff is not protesting defendants' failure to undertake an investigation, but rather their failure to

---

**8.** As defendants note, these cases involve *intentional,* rather than arguably negligent, acts by state officials. We return to the matter of the intentional or negligent character of the officials' conduct at page 18, *infra.*

convey information that might have enabled her to obtain a court hearing.

■ As already suggested, plaintiff's status as a juvenile offers no excuse. Defendants contend that "the Constitutional requirements of *Bounds* have never been applied to juvenile correctional systems." We reject any implication that the constitutional right of access to the courts does not apply to juveniles in DYS custody. The Supreme Court has clearly recognized the due process rights of minors in the adjudicatory stage of the juvenile process. *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). *See Schall v. Martin*, 467 U.S. 253, 263, 104 S.Ct. 2403, 2409, 81 L.Ed.2d 207 (1984) (reviewing the basic constitutional protections that apply to juveniles accused of crimes). In deciding that the "proof beyond a reasonable doubt" standard applies to juveniles, the Court made an observation that is relevant to this case:

It is true, of course, that the juvenile may be engaging in a general course of conduct inimical to his welfare that calls for judicial intervention. But that intervention cannot take the form of subjecting the child to the stigma of a finding that he violated a criminal law and to the possibility of institutional confinement on proof insufficient to convict him were he an adult.

*In re Winship*, 397 U.S. 358, 367, 90 S.Ct. 1068, 1074, 25 L.Ed.2d 368 (1970) (footnote omitted). In the present instance, similarly, it might be argued that it would not have been in plaintiff's best interests to reopen her criminal case. But by effectively denying plaintiff the opportunity to petition for a new trial, defendants risked allowing plaintiff to remain branded with a possibly false adjudication that she had assaulted her father.

■ We hold that a juvenile has a right of access to the courts in the adjudicatory stage of the juvenile process, including instances in which new evidence may allow the juvenile to petition the court for a new trial. If new evidence suggests that a minor may have been unfairly accused of a crime, her custodians have at least as much of an obligation to take action to enable the minor to clear her name as would the custodians of an adult inmate. *Cf. Coleman v. Alabama*, 827 F.2d 1469 (11th Cir.1987) (holding that the failure of state employees to advise juvenile of his right to request special consideration under state Youthful Offender Act violated juvenile's due process rights). Indeed, custodians of a minor may well have a *greater* obligation to take action to ensure the minor's "meaningful access" to the courts than do the custodians of an adult inmate, because of the minor's greater reliance on the correctional system for care and protection.

■ We agree, then, with the district court's premise that defendants' conduct might have interfered with plaintiff's constitutionally secured right of access to the courts. We also agree with the district court that the right of access was sufficiently clear in 1980, when the conduct in question took place, as to preclude qualified immunity for defendants, if they willfully or with reckless indifference interfered with such right. As the district court stated, defendants can be held liable under section 1983 if they violated a "clearly established ... constitutional right of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). In order to sustain a finding that a "clearly established" right was violated, it is not necessary for plaintiff to cite cases in which the specific sort of conduct complained of was found to be unlawful. "It is enough, rather, that there existed case law sufficient to clearly establish that, if a court *were* presented with such a situation, the court would find that plaintiff's rights were violated." *Hall v. Ochs*, 817 F.2d 920, 925 (1st Cir.1987). In 1980, the contours of the right of access to the courts were sufficiently clear so that a reasonable official would understand that the right would be violated by the intentional or recklessly indifferent withholding of potentially exculpatory information from an adjudicated delinquent or from the court itself.

## III. WAS DEFENDANTS' CONDUCT "MERELY NEGLIGENT"?

The difficulty in this case is whether defendants' conduct was sufficiently willful or reckless to have violated the Constitution. Denial of the constitutional right of access to the courts can most clearly be viewed as a denial of the Fourteenth Amendment guarantee that the state shall not "deprive any person of life, liberty, or property, without due process of law." *See Wolff v. McDonnell,* 418 U.S. 539, 579, 94 S.Ct. 2963, 2986, 41 L.Ed.2d 935 (1974) ("The right of access to the courts ... is founded in the Due Process clause").[9] In claiming that defendants interfered with her access to the courts, plaintiff is contending that she was deprived of liberty without due process of law.

In *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), and *Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986), the Supreme Court made clear that not all actions of state officials that result in a loss of life, liberty, or property are "deprivations" within the meaning of the Fourteenth Amendment. In particular, the Court held that "the Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty or property." *Daniels,* 106 S.Ct. at 663 (emphasis in original). As a result, such negligent conduct is not actionable under section 1983.

In *Daniels,* a prisoner sued prison officials under section 1983, alleging that he was injured when he slipped on a pillow negligently left on a staircase by a correctional deputy. In *Davidson,* a prisoner was injured by a fellow prisoner after prison officials had negligently failed to take action to protect the inmate. In both cases, the Court held that the due process clause was not implicated. The Court noted that the guarantee of due process has historically been applied to "*deliberate* decisions of government officials to deprive a person of life, liberty or property." *Daniels,* 106 S.Ct. at 665 (emphasis in original) (citations omitted). The due process clause was " ' "intended to secure the individual from the arbitrary exercise of the powers of government." ' " *Id.* (quoting *Hurtado v. California,* 110 U.S. 516, 527, 4 S.Ct. 111, 116, 28 L.Ed. 232 (1884), in turn quoting *Bank of Columbia v. Okely,* 4 Wheat. (17 U.S.) 235, 244, 4 L.Ed. 559 (1819)). The Court held that negligent conduct does not implicate these traditional concerns:

> Far from an abuse of power, lack of due care suggests no more than a failure to measure up to the conduct of a reasonable person. To hold that injury caused by such conduct is a deprivation within the meaning of the Fourteenth Amendment would trivialize the centuries-old principle of due process of law.

*Daniels,* 106 S.Ct. at 665.

*Intentional* interference by government agents with a person's right to life, liberty, or property may of course activate the protections of the due process clause. *See, e.g., Simmons v. Dickhaut,* 804 F.2d 182, 185 (1st Cir.1986). In *Daniels,* the Supreme Court left open whether a deprivation under the Fourteenth Amendment must be intentional, or whether "something less than intentional conduct, such as recklessness or 'gross negligence,' is enough to trigger the protections of the Due Process Clause." 106 S.Ct. at 667 n. 2. Cases in this circuit suggest that government offi-

---

9. The right of access to the courts has also been viewed as founded in the First Amendment right to petition the government, *see California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510, 92 S.Ct. 609, 611, 30 L.Ed.2d 642 (1972), and as being one of the privileges and immunities accorded to citizens under Article IV and the Fourteenth Amendment. *See Chambers v. Baltimore & Ohio R. Co.,* 207 U.S. 142, 148, 28 S.Ct. 34, 35, 52 L.Ed. 143 (1907). For discussions of the constitutional underpinnings of the right of access to the courts, *see Simmons v. Dickhaut,* 804 F.2d 182, 183 (1st Cir.1986); *Bell v. City of Milwaukee,* 746 F.2d 1205, 1262–63 (7th Cir.1984); *Ryland v. Shapiro,* 708 F.2d 967, 971–72 (5th Cir.1983). We follow the district court's view that the right of access to the courts is a species of due process right, because this seems to be the clearest and most direct derivation of the right of access. Neither party takes issue with this analysis. Thus, we need not consider whether our discussion of negligent and intentional conduct would be any different if the denial of the right of access were viewed as a violation of the First Amendment or of the privileges and immunities clause.

cials may be held liable for a deprivation of life, liberty, or property without due process if their conduct reflects a reckless or callous indifference to an individual's rights. *See, e.g., Maldonado Santiago v. Velazquez Garcia*, 821 F.2d 822, 831 (1st Cir.1987); *Clark v. Taylor*, 710 F.2d 4, 9 (1st Cir.1983). An official displays such reckless or callous indifference when it would be manifest to any reasonable official that his conduct was very likely to violate an individual's constitutional rights. Although such reckless or callous indifference falls short of intentional or willful conduct, it still may exemplify the "arbitrary exercise of the powers of government." *Daniels*, 106 S.Ct. at 665. Negligence, in contrast—no matter how "gross" it may be—exemplifies lack of care, rather than the abuse of power.[10]

■ We apply this standard of "reckless or callous indifference" to the present case. Plaintiff does not allege that defendants *intentionally* interfered with her liberty.[11] What plaintiff does allege is that

defendants displayed "reckless or callous indifference" to her rights. Plaintiff made this argument in the court below, as well as to us, in regard to her request for a jury instruction on punitive damages. But this argument can be transplanted to the prior question of defendants' liability. Because we are reviewing the district court's grant of summary judgment against defendants on liability, we view the evidence in the light most favorable to defendants. The summary judgment can be sustained only if, viewing the evidence in their favor, defendants' conduct was not merely negligent, but deprived plaintiff of her liberty through reckless or callous indifference.

■ When viewed from this perspective, we conclude that the summary judgment for plaintiff must be reversed, and the case remanded to the district court for reconsideration of the issue of liability. Defendants' conduct could be found as a matter of law to be recklessly or callously indifferent only if defendants clearly knew

---

10. The distinction among such categories as "negligence," "reckless or callous indifference," and "intentional" conduct can be elusive. According to general tort principles, however, a central distinction among these categories involves the actor's degree of certainty that negative consequences will result from his act or omission. If a person acts either with the desire to cause the harm or with the belief that the harm is certain to result, the action is labeled "intentional." If the actor has no such desire or belief, but acts unreasonably in light of the risks, his behavior is labeled "negligent." Between the poles of "intent" and "negligence" lies the gray area of "reckless indifference." *See* W.P. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on the Law of Torts* § 31, at 169–70 (5th ed.1984). In the present context, involving concerns about the abuse of power, we find it most appropriate to view "reckless or callous indifference" not as a heightened degree of negligence (akin to "gross negligence"), but rather as a lesser form of intent. An intentional violation of a person's constitutional rights occurs if the official desires to cause such a violation or believes that his conduct is certain to result in such a violation. A recklessly or callously indifferent violation occurs, in contrast, if the official believes (or reasonably should believe) that his conduct is *very likely* (but not certain) to result in such a violation. *See Restatement (Second) of Torts* § 500, comment f (1977) (comparing intentional misconduct and recklessness). *Cf. Cook v. Avien, Inc.*, 573 F.2d

685, 692 (1st Cir.1978) (approving the view, in the context of a securities fraud case, that "reckless conduct 'comes closer to being a lesser form of intent than merely a greater degree of ordinary negligence'") (quoting *Sanders v. John Nuveen & Co.*, 554 F.2d 790, 793 (7th Cir.1977)).

11. It is true that the evidence could support the finding that defendants' omissions were deliberate, in the sense of being consciously intended rather than purely inadvertent. Thus, there is no contention that Vance and Paladino simply *forgot* to tell plaintiff about her parents' statement. To the contrary, Vance and Paladino may have *decided* not to relay the information. But the fact that an act or omission is deliberate, rather than inadvertent, does not mean that it should necessarily be characterized as "intentional." In the *Davidson* case, defendant Cannon, the assistant superintendent of the prison, failed to act to protect inmate Davidson, not out of inadvertence, but because he "mistakenly believed that the situation was not particularly serious." *Davidson*, 106 S.Ct. at 670. The Supreme Court regarded Cannon's failure to take corrective action not as an intentional act, but as an instance of "lack of due care." *Id.* As Justice Blackmun noted in his dissenting opinion, "It is important not to confuse negligence with the absence of deliberate action. Negligent acts are often deliberate." *Davidson*, 106 S.Ct. at 673 n. 2 (Blackmun, J., dissenting) (citing W. Prosser & W. Keeton, *Law of Torts* § 31, at 171 (5th ed.1984).

(or reasonably should have known) that their failure to report the parents' statement to plaintiff or to the Woburn District Court was very likely to deprive her of her constitutionally protected liberty. The evidence on summary judgment does not compel such a conclusion.

Not all decisions to withhold information that might conceivably bear on a juvenile's case can be viewed as reckless or callous acts. Such a decision is recklessly indifferent only if the information is of such obvious import that withholding it would appear very likely to lead to a miscarriage of justice. Clear evidence of mistaken identity, showing that the wrong person was being held in custody, might fall into this category. On this record, however, it cannot be said as a matter of law that defendants knew (or reasonably should have known) that the parents' statement was of such great significance that failure to transmit it would be likely to compromise plaintiff's rights.

There are several reasons for suspecting that the parents' statement was not of such clear import as to render the defendants' failure to communicate it to plaintiff or to the state court a recklessly indifferent act. In the first place, defendants could not be certain whether or not the parents' statement was true. Defendants could justifiably have viewed plaintiff's entire family situation as a confused and pathological one. In this context, they may not have taken the parents' statement at face value. From defendants' viewpoint, the "recantation" itself could have seemed a possible fabrication, perhaps because of the parents' second thoughts about the consequences of the father's earlier truthful testimony.

Second, defendants may have been under the impression that any fabrication of testimony had been done, in the first instance, with plaintiff's own knowledge and acquiescence. The following statement in Vance's case report—the same report that recorded the parents' statement—is consistent with this interpretation: "Sue [the plaintiff] ... says some of [her] anger towards parents was fabricated in order for parents to get a placement for her and parents confirm this." If the father's testimony resulted from collusion between plaintiff and her parents, there was less reason to convey to plaintiff or even to the court the parents' admission that the testimony had been fabricated.

Third, it was not necessarily clear to defendants that if they were to relay the parents' statement to plaintiff or to the Woburn District Court, plaintiff would in turn desire or attempt to reopen the juvenile proceeding. Given that plaintiff had pleaded delinquent to the assault and battery charge, defendants might have concluded that plaintiff—despite her protestations of innocence—would prefer not to reopen the case. Indeed, after the alleged fabrication was reported to the Woburn District Court judge, plaintiff and her newly appointed lawyer decided not to petition for a new trial.

Fourth, it was not necessarily apparent to defendants that even if the parents' statement were to be communicated to plaintiff or to the state court, plaintiff's adjudication as a delinquent would be reversed. When the parents told Vance that the father had fabricated his testimony, they did not suggest that he was willing to recant his testimony in court—and, in the process, to admit to perjury. Even if the father were willing to take this step, it was not entirely clear that the judge would believe the recantation and grant a new trial.

Finally, defendants were not lawyers but caseworkers. What might have seemed obvious to more legally knowledgeable people might have seemed less clear to them. Defendants began with the premise that plaintiff had been legally committed to DYS custody after due consideration of the confused family situation. Their different focus may have predisposed them to a different evaluation from what now, in hindsight, seems correct.

All of these considerations combine to compel the conclusion that defendants could not be found, as a matter of law on summary judgment, to have withheld so manifestly important a datum as to have

recklessly or callously deprived plaintiff of her liberty.[12]  To these considerations, we add that defendants neither ignored nor attempted to cover up the parents' statement.  *Cf. Williams v. City of Boston,* 784 F.2d 430, 435 (1st Cir.1986) (noting that an official cover-up may violate section 1983 if it deprives a plaintiff of his right of access to the courts).  Vance included the parents' statement in her written report on her client, and Paladino discussed it with a Woburn District Court probation officer. Moreover, there is no indication that defendants held any malice toward plaintiff. To the contrary, the record suggests that Vance and Paladino acted with concern for plaintiff, doing what they thought to be in her best interests.

We conclude, then, that although defendants' conduct was unfortunate and in poor judgment, it did not necessarily display reckless or callous indifference to plaintiff's constitutional rights.  In its ruling at the close of the trial refusing to submit the issue of punitive damages to the jury, the district court appears to have reached the same conclusion.  Indeed, the district court went beyond this conclusion to the finding that, as a matter of law, defendants were not reckless.  In denying plaintiff's motion to instruct the jury on punitive damages, the district court said:

> I don't think you have made a case of recklessness. . . .  The defendants made a fairly technical error, I think, which probably warrants recovery, compensatory recovery, but I don't see recklessness.

> .    .    .    .    .

> The situation was sufficiently confused to preclude any inference, even of reckless or careless conduct.

The district court made this statement when it held that a jury instruction on punitive damages would not be justified. In a section 1983 case of this type where liability calls for intentional or reckless conduct, the threshold given to the jury for its determination of whether to award punitive

damages is similarly phrased—that is, "evil motive or intent, or . . . reckless or callous indifference to the federally protected rights of others."  *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983).  The Supreme Court has held that "this threshold applies even when the underlying standard of liability for compensatory damages is one of recklessness." *Id.  See also Clark v. Taylor,* 710 F.2d 4, 14 (1st Cir.1983) (noting that the threshold of conduct for which punitive damages may be assessed in this type of section 1983 suit is "virtually the same as that required for an award of compensatory damages"). Thus, the district court's finding that there was no recklessness for purposes of punitive damages suggests that there was also no recklessness for purposes of liability.

Given this finding by the district court after hearing the evidence at the damages trial, a strong argument can be made for granting summary judgment not to plaintiff but to defendants.  We prefer not to take this step, however.  That "mere negligence" cannot sustain section 1983 liability was a factor apparently not considered by the court below when ruling on liability at the summary judgment stage.  Therefore, we think it more appropriate to remand the case to the district court to reconsider the issue of liability under the proper standard. Plaintiff has argued to us a view of the evidence that might suggest that defendants were in fact recklessly or callously indifferent.  This argument, in a nutshell, is that defendants' decision to withhold the potentially exculpatory information from plaintiff reflected the self-righteous attitude that plaintiff *must have* been guilty of the alleged offense, and even if she was not, she was still a problem child who should remain in DYS custody.  We are not convinced that this theory—in effect, an indictment of DYS employees' alleged paternalism—would suffice to ground a jury finding of "reckless and callous indifference" under the circumstances of this case. Rather than deciding the issue, however,

**12.**  In this respect, this case seems analogous to *Davidson v. Cannon,* 106 S.Ct. at 670, in which the Supreme Court accepted the district court's finding that the failure of a prison employee to

protect an inmate, because he "mistakenly believed that the situation was not particularly serious," was negligent, but not intentional or reckless.

we remand it to the district court for consideration.

On remand, the district court may or may not, at its discretion, admit further materials relevant to defendants' cross-motion for summary judgment. The district court may conclude, consistent with its own finding at the close of the trial on punitive damages, that the evidence cannot as a matter of law sustain a finding of liability and that summary judgment for defendants is appropriate. Alternatively, the district court may order a trial, to consider the issue of liability as well as of damages, *infra*.

## IV. THE SUMMARY JUDGMENT FOR DONADINI

■ The original defendants in the case included Mark Mulcahy and James Donadini, Jr., the DYS caseworker and assistant regional director who assumed responsibility for plaintiff after her case had been transferred to a new region. After learning of plaintiff's parents' statement that the father's testimony had been fabricated, Mulcahy and Donadini immediately relayed this information to the plaintiff. The district court found that this action by Mulcahy and Donadini "fulfill[ed] their constitutional duty." *Germany*, 673 F.Supp. at 1148. The court therefore granted summary judgment in favor of Mulcahy and Donadini. Plaintiff appeals only from the summary judgment for Donadini. We affirm the summary judgment for Donadini, although on different grounds from those relied on by the district court.

The district court found that on June 9, 1980, after reporting the parents' statement to plaintiff, Donadini told plaintiff that " 'anything which can be done to help the situation' would be done." *Id.* at 1145. Plaintiff contends that Donadini took no action until almost four months later, on October 1, 1980. At that time, Donadini sent a letter to Judge Cullen of the Woburn District Court, informing him that plaintiff's parents had admitted that the charges against plaintiff had been "falsified in an effort to obtain services for Suzanne." Plaintiff suggests that Donadi-

ni's delay in informing the court of the alleged falsification constituted an unconstitutional denial of access to the courts. Plaintiff also argues that she relied on Donadini's assurance that "anything that could be done for me would be done." By failing to discharge the responsibility that he had assumed, plaintiff argues, Donadini effectively deprived her of the opportunity to petition the court for relief.

■ The district court seems to have decided that by relaying the parents' statement to plaintiff, Donadini (along with Mulcahy) automatically "fulfill[ed] [his] constitutional duty." *Id.* at 1148. To the extent that it *equated* conveying this information to plaintiff with safeguarding plaintiff's liberty, the district court erred. Suzanne Hussey (Germany) was 16 years old and had not completed the tenth grade at the time that she was informed of her parents' statement. We cannot say that under these circumstances simply relaying the parents' statement to plaintiff was the sort of "affirmative conduct" needed to ensure her right of access to the courts. It is possible that a DYS employee entrusted with the supervision of a minor had the duty to take further steps—for example, by personally bringing the information to the attention of the court or, at least, to some other DYS official or legal officer who could be expected to take proper action.

Despite this, we affirm the summary judgment for Donadini because it is apparent that his delay in reporting the information to Judge Cullen, after having earlier advised plaintiff, was, at worst, merely negligent. There is no evidence to suggest that Donadini's delay was either intentional or reckless. *See Daniels*, 106 S.Ct. 662; *Davidson*, 106 S.Ct. 668. Donadini did not set out to deprive plaintiff of her liberty, nor was it self-evident that his delay would make such a deprivation very likely. Moreover, plaintiff's argument about the paternalism of DYS employees seems less applicable to Donadini's delay—after plaintiff herself had been told of her parents' statement—than it is to Vance's and Paladino's failure to tell plaintiff of the statement.

We conclude, therefore, that under the Supreme Court's holdings in *Daniels* and *Davidson,* the complaint against Donadini must be dismissed.

## V. DAMAGES

In addition to their appeals from the summary judgments, defendants appeal from the jury award to plaintiff of $40,000 in compensatory damages. Defendants protest, in particular, that the district court erred in admitting evidence of events that occurred after plaintiff had left Vance's and Paladino's supervision. Plaintiff, for her part, appeals from the district court's failure to instruct the jury that it could award punitive damages to plaintiff. Because we have reversed the summary judgment in favor of plaintiff against Vance and Paladino, we need not confront these issues at this time. It is possible that the district court, on remand, will award summary judgment to defendants and that, therefore, a new trial will not take place. In the event that a new trial does take place, however, we see no clear error in the district court's admission of the evidence of damages suffered by plaintiff after she had left Vance's and Paladino's supervision. The district court's instruction sufficed to make clear to the jury that it could impose damages only if it found that the harm had actually been caused by defendants' conduct.

We also observe that damages may be imposed in a new trial only if the jury finds that defendants recklessly or callously deprived plaintiff of her liberty. If a jury were to make such a finding, it would be appropriate for it to consider punitive, as well as compensatory, damages. As discussed above at page 20, in a section 1983 case involving the deprivation of liberty without due process, the standards for a) imposing liability and b) allowing a jury to consider punitive damages are virtually identical.

## VI. CONCLUSION

For the reasons stated, summary judgment for plaintiff against defendants Vance and Paladino is reversed. On re-

mand, the district court is directed to reconsider Vance's and Paladino's liability, in conformity with the standards that we have enunciated. The district court may either award summary judgment in favor of Vance and Paladino, or it may order a new trial on both liability and punitive damages. The jury's present finding on compensatory damages may, in such event, stand unless the district court determines, in its discretion, that it should hold a new trial on compensatory damages also. *See Winn v. Lafayette Town House,* 839 F.2d 835 (1st Cir.1988); *Crane v. Consolidated Rail Corp.,* 731 F.2d 1042, 1049–51 (2d Cir.1984) (discussing factors relevant to conducting retrial limited to liability). Summary judgment in favor of Donadini is affirmed.

*Vacated and remanded for proceedings consistent herewith.*

## MEMORANDUM AND ORDER

■ In her petition for rehearing, Germany argues that we were wrong to apply the Supreme Court's holding in *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), to the present case. But the Court's explicit and unqualified language in *Daniels* leaves little room for debate:

> We conclude that the Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty, or property.

474 U.S. at 328, 106 S.Ct. at 663 (emphasis in original). Germany does not dispute the holding of the district court, which we adopted, that the right of access to the courts is based in the Due Process Clause. Therefore, *Daniels* must prevail. To the extent that the many pre-*Daniels* cases cited by Germany suggest anything different, they must be viewed as having been overruled by *Daniels.*

Germany also notes that two First Circuit cases that we cited, allowing for recovery of damages caused by "reckless or callous indifference" to constitutional rights, involved prison officials. *Maldona-*

do Santiago v. Velazquez Garcia, 821 F.2d 822, 831 (1st Cir.1987); *Clark v. Taylor*, 710 F.2d 4, 9 (1st Cir.1983). She argues that we inappropriately extended this standard to all government officials, such as the caseworkers in the present case. But Germany fails to come to terms with the fact that the Supreme Court's holding in *Daniels*—that mere negligence does not implicate the Due Process Clause—is not restricted to prison officials.* The "reckless or callous indifference" standard is one that is not inconsistent with *Daniels, see* 474 U.S. at 334 n. 3, 106 S.Ct. at 666 n. 3, and that stays in harmony with our circuit's precedents.

Our opinion is also consistent with *DeShaney v. Winnebago County Department of Social Services,* — U.S. —, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), announced by the Supreme Court after our opinion in the present case was issued. In *DeShaney*, the Court held that the failure of state social workers to remove a child from the custody of an abusive father, who proceeded to cause tragic injury to the child, did not violate the child's rights under the Due Process Clause. The Court held that "[a]s a general matter, ... a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." — U.S. at —, 109 S.Ct. at 1000. In the present case, in contrast, we held that the defendant caseworkers had an affirmative obligation to plaintiff Germany because of the "special relationship" (custodial in nature) between these state officials and a juvenile in their custody. At 15. This holding is in accord with the Supreme Court's observation in *DeShaney* that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." — U.S. at —, 109 S.Ct. at 1005 (citing *Youngberg v. Romeo,* 457 U.S. 307,

317, 102 S.Ct. 2452, 2458, 73 L.Ed.2d 28 (1982)).

When there is such an affirmative duty, nothing in *DeShaney* suggests that a merely negligent breach of that obligation could constitute a violation of the Due Process Clause. The very same factors that created an affirmative duty here (a custodial relationship) created the duty in *Daniels*, where the Court rejected a mere negligence standard. *DeShaney* forcefully restates the Court's view that "the Due Process Clause ... does not transform every tort committed by a state actor into a constitutional violation." — U.S. at —, 109 S.Ct. at 1006 (citing, *inter alia, Daniels,* 474 U.S. at 335–336, 106 S.Ct. at 667). Indeed, Justice Brennan's dissent in *DeShaney* acknowledges the following:

> [T]hat the Due Process Clause is not violated by merely negligent conduct, see *Daniels, supra,* and *Davidson v. Cannon,* 474 U.S. 344 [106 S.Ct. 668, 88 L.Ed.2d 677] (1986), means that a social worker who simply makes a mistake of judgment under what are admittedly complex and difficult conditions will not find herself liable in damages under § 1983.

— U.S. at —, 109 S.Ct. at 1012 (Brennan, J., dissenting). Justice Brennan's observation is strikingly apt in the present case.

*The petition for rehearing is denied.*

---

* Of course, even if the *Daniels* standard is viewed as specially applicable to prison-type situations, this does not make it irrelevant here: the "special relationship" which, as we held, imposed a

duty upon the defendant caseworkers grew out of the custodial nature of the relationship. Thus an analogy to prisoner cases, far from being remote, is direct and obvious.