**Quimby v. DCYS**                    **CV-93-351-B    12/20/95**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


Robert W. Quimby, as Administrator of
the Estate of Christal Quimby

     v.                                          Civil No. 93-351-B

Division for Children, Youth and
Families, et al.



**MEMORANDUM AND ORDER**

     Robert W. Quimby, Administrator of his daughter Christal's estate, brings suit against the New Hampshire Division for Children, Youth, and Families ("DCYF")[1], its deputy director, Robert Pidgeon, and three DCYF case workers, Lorelei Duquette, Mimi Wheeler, and Wendy Robertson.  The case arises from injuries Christal sustained after being sexually assaulted by her foster father, Christian Telles.  Quimby bases his claims on 42 U.S.C.A. § 1983 and state negligence law.  His § 1983 claims allege that the individual defendants violated Christal's right to substantive due process by placing her in the Telleses' home and

---

     [1]  Prior to 1994, the DCYF was known as the Division for Children and Youth Services.  N.H. Rev. Stat. Ann. § 212:2 (Supp. 1994).

allowing her to remain there in reckless disregard of the serious risk that Christal would be harmed by the placement. Quimby also alleges that all of the defendants negligently failed to prevent Christal's injuries. The defendants have moved for summary judgment on all counts. For the following reasons, I grant summary judgment in favor of the defendants on the § 1983 claims, and decline to exercise supplemental jurisdiction over Quimby's state law claims.

## I. BACKGROUND

The three Quimby children, Christal, Coreen, and Robert, were removed from their mother's home in 1989 following allegations of abuse and neglect. In November 1989, DCYF placed Christal, age fourteen, and Coreen, age sixteen, in a licensed foster home operated by Christian and Carol Telles in Somersworth, New Hampshire. Coreen was allowed to move in with her grandmother in the summer of 1990 after she complained about the placement. Christal was left with the Telleses.

In February 1991, Christal was removed from the Telleses' home after she became pregnant and made statements suggesting

that Telles was the baby's father.[2]  Despite protective orders and a bail order, Telles continued to contact Christal.[3]  In August 1992, Telles and Christal were involved in an automobile accident in which Christal was killed.

## II.  **STANDARD OF REVIEW**

Summary judgment is appropriate only if the facts taken in the light most favorable to the nonmoving party show that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Guzman-Rivera v. Rivera-Cruz, 29 F.3d 3, 4 (1st Cir. 1994).  On issues where the nonmoving party bears the burden of proof, the moving party initially need only allege the lack of evidence to support the nonmoving party's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  The nonmoving party cannot rely on the pleadings alone to oppose summary judgment, but must come forward with properly supported facts to demonstrate that "the evidence

---

[2]  Christian Telles was later convicted of sexually assaulting Christal.  State v. Telles, 139 N.H. 344 (1995).

[3]  Quimby does not claim that any of the defendants violated Christal's constitutional rights after she was removed from the Telleses' home.

3

is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  I apply this standard in addressing defendants' motion.

## III.  DISCUSSION

Duquette, Wheeler, and Robertson argue that Quimby cannot maintain his substantive due process claims against them because the evidence does not demonstrate that they acted with reckless indifference.[4]  Robert Pidgeon also contends that he cannot be

---

[4]  Quimby bases his substantive due process claim on the theory of liability described by the First Circuit in Germany v. Vance, 868 F.2d 9, 18 n.10 (1st Cir. 1989), which allows a plaintiff to assert a claim against a governmental official who acts with reckless or callous indifference to the plaintiff's protected liberty or property interest.  In Youngberg v. Romeo, 457 U.S. 307 323 (1982), the Supreme Court held that a profoundly retarded institutionalized adult could assert a substantive due process claim against his governmental caregivers if the caregivers' actions were "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment."  After Youngberg was decided, the court ruled in Daniels v. Williams, 474 U.S. 327, 331 (1986) and Davidson v. Cannon, 474 U.S. 344, 347 (1986) that a substantive due process claim cannot be based on mere negligence.  Neither the Supreme Court nor the First Circuit has addressed the Youngberg standard in light of Daniels and Davidson.  Moreover, those courts that have considered the question have come to differing conclusions.  Yvonne L. v. New Mexico Dep't of Human Servs., 959 F.2d 883, 894 (10th Cir. 1992) (following Youngberg

4

liable pursuant to § 1983 because Quimby's evidence is insufficient to establish supervisory liability. All of the defendants join in attacking the sufficiency of the evidence supporting Quimby's state law negligence claims. I begin by considering Quimby's substantive due process claims against the caseworker defendants.[5]

---

standard on the grounds that it was similar to "deliberate indifference" because it "implies abdication of the duty to act professionally"); Shaw by Strain v. Strackhouse, 920 F.2d 1135, 1144-47 (3d Cir. 1990) (holding that Youngberg standard must be applied to all professional employees working with institutionalized retarded individuals while deliberate indifference standard applied to nonprofessional employees); K.H. ex rel. Murphy v. Morgan, 914 F.2d 846, 852-54 (7th Cir. 1990) (noting that neither negligent nor grossly negligent conduct is actionable and following Youngberg standard); Feagley v. Waddill, 868 F.2d 1437, 1440 (5th Cir. 1989) (rejecting a "Youngberg exception" to the rule stated in Daniels and Davidson); Estate of Conners v. O'Connor, 846 F.2d 1205, 1208 (9th Cir. 1988), cert. denied, 489 U.S. 1065 (1989) (holding that Youngberg standard is equivalent to gross negligence and falls within the Daniels and Davidson rule). Since Quimby does not base his due process claim on Youngberg, I need not determine its applicability here.

[5] I assume without deciding that the defendants had a sufficient affirmative duty to protect Christal to subject them to liability for a properly supported substantive due process violation. Compare K.H. ex rel. Murphy, 914 F.2d at 848-499 (child who is sexually assaulted by foster parent has a cognizable due process claim against caseworkers) with Monahan v. Dorchester Counseling Ctr., Inc., 961 F.2d 987, 991 (1st Cir. 1992) (voluntarily admitted mental patient lacks a cognizable due process claim against caregivers with knowledge of patient's suicidal tendencies).

A.    Substantive Due Process - Caseworkers

As I noted in my orders of March 31 and August 19, 1994, the First Circuit Court of Appeals has determined that "government officials may be held liable for a deprivation of life, liberty, or property without due process if their conduct reflects a reckless or callous indifference to an individual's rights." Germany v. Vance, 868 F.2d 9, 17-18 (1st Cir. 1989); accord Febus-Rodriguez v. Betancourt-Lebron, 14 F.3d 87, 92 (1st Cir. 1994); Landol-Rivera v. Cruz Cosme, 906 F.2d 791, 796 (1st Cir. 1990); Torres Ramirez v. Bermudez Garcia, 898 F.2d 224, 227 (1st Cir. 1990). In explaining this standard, the court has stated that it is

> appropriate to view 'reckless or callous indifference' not as a heightened degree of negligence (akin to 'gross negligence'), but rather as a lesser form of intent. An intentional violation of a person's constitutional rights occurs if the official desires to cause such a violation or believes that his or her conduct is certain to result in such a violation. A recklessly or callously indifferent violation occurs, in contrast, if the official believes (or reasonably should believe) that his or her conduct is very likely (but not certain) to result in such a violation.

Germany, 868 F.2d at 18 n.10; accord Febus-Rodriguez, 14 F.3d at 91; Torres Ramirez, 898 F.2d at 227.

6

Quimby alleges that the caseworkers were recklessly indifferent to the strong likelihood that Christal would be injured if she remained with the Telleses because they either knew or reasonably should have known that: (1) Christian Telles had an undisclosed criminal record; (2) he had had his drivers license suspended after being deemed a habitual offender because of numerous traffic violations and at least two convictions for driving while intoxicated; (3) he was an alcoholic and a former drug user; (4) he had been hospitalized for an unspecified mental problem; (5) he had been verbally and physically abusive to other children in his custody; (6) the state of Maine had rejected the Telleses' application for a foster care license; (7) another child had been raped while in the Telleses' custody; and (8) Telles had been physically abused by his father. Quimby supports this argument by offering evidence that most of the adverse information he cites either was contained in Telles' DCYF licensing file or was known to other DCYF officials. He also offers an affidavit from a former DCYF caseworker who opines that "a caseworker is not in a position to perform her job responsibilities unless she is knowledgeable and up-to-date regarding material in the licensing file."

7

Notwithstanding Quimby's contrary assertions, he has failed to support his claim that the caseworkers were aware of any adverse information concerning the Telleses before they learned of Christal's pregnancy and removed her from the Telleses' home. Quimby cannot establish that the caseworkers reviewed the Telleses' licensing file merely by offering an affidavit from a former caseworker who claims that a reasonable caseworker would have inspected the file before placing Christal with the Telleses. Since he offers no other evidence on this point, he cannot rely on information contained in the file to support his claim that the caseworkers acted recklessly.

Quimby's contention that the caseworkers were reckless because they unreasonably failed to discover the adverse information is equally unavailing. Reckless indifference in this context requires evidence either that a defendant actually believed that her actions were very likely to result in injury or that a reasonable person in the defendant's position would have believed that injury would very likely occur. Germany, 868 F.2d at 18 n.10. Quimby does not allege that any of the caseworkers actually believed that Telles was very likely to assault Christal. Nor has he offered any evidence to support his claim that they reasonably should have known that Christal would very

likely be injured if they allowed her to remain with the Telleses without first reviewing the licensing file. Defendants cannot be held liable for a substantive due process violation on a failure to investigate theory.

I now turn to the other evidence Quimby relies on to support his substantive due process claims against each of the caseworker defendants.

### 1. Lorelei Duquette

Lorelei Duquette filed the abuse and neglect petition on behalf of the Quimby children in October 1989 and signed the consent agreement on behalf of DCYF providing that Coreen and Christal would be placed "in a licensed foster home, as arranged by DCYS." Duquette's duties also involved placing the girls with the Telleses in November 1989. Quimby offers no evidence to suggest that Duquette was aware of any adverse information about the Telleses' background when she placed Christal in their home. Therefore, he has not produced enough evidence to allow a reasonable factfinder to conclude that Duquette was recklessly or callously indifferent to Christal's constitutional rights.

### 2. Wendy Robertson and Mimi Wheeler

Wendy Robertson and Mimi Wheeler were family service

9

caseworkers for the Quimby girls.  Robertson worked with them from March until November 1990 when Wheeler assumed responsibility for the children.  Taking the facts in the light most favorable to Quimby, the following circumstances provide the most compelling support for his claims.

Problems arose with the girls' placement for the first time in the summer of 1990.  Robertson's notes for that period indicate that the girls were not getting along with Carol Telles, that Carol was jealous of them, that the Telleses were fighting about the girls, and that Carol Telles had called DCYF "ranting and raving" about Coreen and stating, without further explanation, that Coreen was breaking up their marriage.  Robertson's notes state that she wanted to get both girls out of the Telleses' home and that "[t]hings are bad at the Telleses." Notwithstanding her concern, Robertson only moved Coreen.

Mimi Wheeler became Christal's caseworker in November 1990. Wheeler's notes state that her first contact with Christal was for a supervised visit between Christal and her mother on November 9.  The notes also indicate that during a visit with her mother in December, "C[hristal] stated that she wants a baby." Christal's pregnancy and sexual relationship with Telles came to light two months later.

Quimby does not contend that either Wheeler or Robertson actually believed that Christal was very likely to be harmed if she were left in the Telleses' custody. Therefore, the question I must answer is whether a rational trier of fact could conclude from the evidence presented that either defendant reasonably should have believed, based upon what they knew about the Telleses, that Christal was very likely to be injured if she were allowed to remain with them. Although responsible persons in the defendants' positions might well have been concerned about Christal based on the problems she and Coreen were reportedly having during the summer and fall of 1990, and although that concern might well have been heightened by Christal's comment to her mother about wanting to have a baby, careless and unreasonable actions are not necessarily reckless. Quimby's evidence in this case fails to meet the standard required for a substantive due process violation even when the evidence is construed in his favor.

B. Substantive Due Process - Supervisory Liability

Robert Pidgeon was Deputy Director of DCYF from 1986 until 1994. Quimby argues that Pidgeon is liable as a supervisor of

11

others who violated Christal's constitutional rights.[6] As I noted in my March 31, 1994, order, a defendant cannot be held liable on a § 1983 claim based upon a respondeat superior theory. Febus-Rodriguez, 14 F.3d at 92 (citing Guitierrez-Rodriguez v. Cartegena, 882 F.2d 553, 562 (1st Cir. 1989). Instead, a plaintiff must establish that (1) the defendant's subordinates violated the plaintiff's constitutional rights, and (2) an affirmative link existed between the defendant's supervisory activities and the subordinates' behavior in the sense of "supervisory encouragement, condonation or acquiescence" or deliberate, reckless, or callous indifference to a violation of the constitutional rights of third persons. Hegarty v. Somerset County, 53 F.3d 1367, 1380 (1st Cir.) (quoting Lipsett, 864 F.2d at 902-03), cert. denied sub nom Hegarty v. Wright, 1995 U.S. LEXIS 8635 (U.S. Dec. 11, 1995); Febus-Rodriguez, 14 F.3d at 92.

Quimby's claim against Pidgeon fails on both counts. First, as I have already noted, Quimby has not adequately supported his substantive due process claim against any of Pidgeon's subordinates. Second, even if Pidgeon's subordinates had violated

---

[6] Quimby does not assert that Pidgeon is liable in any capacity other than as a supervisor.

12

Christal's constitutional rights, Quimby has failed to demonstrate that an affirmative link existed between Pidgeon's supervisory responsibilities and his subordinates' unconstitutional actions.

In an effort to support his claim, Quimby relies on Pidgeon's interrogatory answer in which he was asked to explain all of his contacts with the Telleses. His answer states, "I attended no meetings with Mr. and Mrs. Telles. At one time, I discovered that licensed capacity in that home was exceeded, and instructed staff to bring home into compliance. This probably occurred in 1989 or 1990." From that answer, Quimby concludes that Pidgeon was required "to ensure the home meets all DCYS requirements." Extrapolating from the presumed responsibility for licensing, Quimby also presumes that Pidgeon had actual or constructive knowledge of the Telleses' licensing file.

Pidgeon states in his affidavit that he held a policy-making and supervisory position far removed from decision-making concerning the licensing of foster care facilities and the placement of children. He denies any involvement in the licensing of the Telleses' home, any contact with the Telleses, and any knowledge of matters that would have disqualified Christian Telles as a foster parent. He explains that his only

13

information about the Telleses was that there had been a change in the number of children allowed under their license, which they were exceeding due to court ordered placements, and that they had a reputation as a placement that would accept difficult teen-agers.  These allegations are unrefuted.

Despite Pidgeon's involvement in reducing the number of children in the Telleses' home, there is no evidence that he had responsibility for foster home licensing.  The fact that he ordered compliance with a licensing requirement that came to his attention in one instance does not establish his general respon-sibility for licensing or his particular responsibility to review all of the Telleses' licensing requirements.  Quimby has not presented evidence that Pidgeon ever saw the licensing file, knew its contents, or had a legal duty to see the file, update its information, or review the Telleses' foster care license during the relevant period.  Quimby also has not shown that Pidgeon knew, or should have known, from any other source that Telles presented a substantial risk of harm to children placed in his home.  Further, the record contains no evidence to suggest that Pidgeon condoned, acquiesced in, or showed deliberate indifference to a subordinate's conduct and thereby caused improper licensing of the Telleses or improper placements there.

14

Accordingly, Quimby cannot maintain a supervisory liability claim against Pidgeon.

## C.  Pendent State Law Tort Claims

The first five counts in Quimby's complaint state negligence claims against DCYF and each of the four individual defendants. Having granted summary judgment for the defendants on Quimby's § 1983 claims, I decline to exercise supplemental jurisdiction over the pendent state law claims.  See 28 U.S.C.A. § 1367(c)(3) (West 1993).


## IV.  CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment (document no. 38) is granted as to counts VI through IX. Counts I through V are dismissed without prejudice.

SO ORDERED.


_____
Paul Barbadoro
United States District Judge

December 20, 1995

cc:  Charles Douglas, Esq.
     Nancy Smith, Esq.

15