**Willie X. STEVENSON and Ronald Paul Adams et al., Plaintiffs,**

**v.**

**Jack K. REED et al., Defendants.**

**No. GC 73–76–K.**

United States District Court,
N. D. Mississippi,
Greenville Division.

March 27, 1975.

David M. Lipman, Jackson, Miss., National Legal Aid and Defender Asso., National Prison Project of the American Civil Liberties Union, amicus curiae, for plaintiffs.

P. Roger Googe, Asst. Atty. Gen., Jackson, Miss., for defendants.

## MEMORANDUM OPINION

KEADY, Chief Judge.

This § 1983 class action is a separate chapter of litigation against the Mississippi State Penitentiary brought by Willie X. Stevenson and Ronald Paul Adams, black and white inmates respectively, seeking declaratory and injunctive relief on behalf of all present and future penitentiary inmates against the penitentiary superintendent and other prison officials.[1] Plaintiff-inmates contend that defendants have failed to provide the inmate population with adequate means to have access to the courts for redress of grievances and legal resources sufficient to enable them to pursue their legal and constitutional rights. They assert that, as a constitutional minimum, prison inmates are entitled to access both to an adequate law library and state-supplied legal counsel.

On July 3, 1974, the parties submitted stipulations, upon which the court entered a consent order, which satisfied one aspect of the plaintiffs' dual contentions. By that order, defendants are bound to establish and maintain an adequate central law library, the contents of which were specified, for the use of all penitentiary inmates.[2] To assure inmate access to these legal materials, moreover, defendants were directed to promulgate and submit to the court rules governing library hours, use and procedures. Defendants submitted such rules and regulations (Appendix A), which counsel for plaintiffs found unobjectionable. We find that these procedures, until experience may prove otherwise, provide reasonable access by the inmate population to the central library materials.

This disposition of the law library question left only the issue of state-supplied legal counsel for consideration. When agreement between the parties on this point proved impossible, the court, on January 27, 1975, conducted an evidentiary hearing, at which extensive stipulations, live testimony, and materials were entered into evidence. In addition to pretrial briefs from the parties, the court allowed National Legal Aid and Defender Association and the National Prison Project of the American Civil Liberties Union to participate ami-

---

1. Soon after commencement of this action, the court, on December 21, 1973, ordered its consolidation with Gates v. Collier, GC 71–6–K, the progenitor suit challenging conditions at Mississippi State Penitentiary. The Rule 23 class action determinations previously made are here applicable. Gates v. Collier, 349 F.Supp. 881 (N.D.Miss.1972), Fn. 1. Jack K. Reed, Superintendent, was substituted as defendant in lieu of William I. Hollowell, pursuant to Rule 25(d), F.R.Civ. P.

2. Defendants thereafter installed in the penitentiary's centrally-located Security Building a comprehensive library of criminal law materials, including federal and Mississippi cases, digests, encyclopedias, textbooks and treatises featuring criminal jurisprudence. No attack upon the adequacy of these materials is made by plaintiffs.

cus curiae. The case being ripe for decision, we incorporate herein findings of fact and conclusions of law, as required by Rule 52.

## I. FACTS

The Mississippi State Penitentiary, familiarly known as Parchman and situated in rural Sunflower and Quitman Counties, has never provided legal counsel of any description for its 2100 inmates. Indeed, Mississippi has not established a statewide public defender program; three of the state's 82 counties sponsor public defender programs which defend indigents accused of felonies, but in the other 79 counties all defense of the indigent accused is performed by local bar members, upon court appointment. Two other service agencies routinely handle inmate requests for legal assistance—Mississippi Prisoners' Defense Committee, a privately funded group sponsored by Lawyers' Committee for Civil Rights Under Law, located at Jackson, and North Mississippi Rural Legal Services, a federally funded organization with offices at Greenwood, Oxford, West Point, Batesville, and Holly Springs. Parchman inmates earn no wages for work performed at the institution and for the most part are indigent individuals who must rely on pro bono publico representation if they are to obtain professional legal counsel. Due to its rural location, Parchman is not close to any large municipality supporting an extensive bar association.

Despite the paucity of readily available attorneys to handle inmate legal matters, the penitentiary does permit or provide a wide-ranging panoply of services designed to facilitate inmate access to the state and federal courts. First, as previously noted, a modern law library has now been established at the institution which contains legal resources fully adequate for preparation of workmanlike legal documents and briefs on questions of inmate rights; and the library operates under rules and regulations designed to allow all inmates reasonable access to these materials.

Second, inmates proficient in legal draftsmanship and analysis are normally found at Parchman, and they may assist other inmates to pursue their claims. For legitimate security reasons, however, inmate writwriters are not permitted to travel among the various residential camps which are widely scattered over the prison farms, and there confer with "client-inmates". Thus, writwriting assistance is, by and large, limited to those inmates who reside in the same residential camp as does the writwriter. In some instances, particularly with frequently changing personnel, it is possible that a particular camp may be bereft of a "jail-house" lawyer.

Third, prison rules allow inmates to purchase and possess their own legal materials and to keep typewriters at their resident camps. Indigent inmates can obtain free transcripts of their state court trials and in forma pauperis filing and service of process privileges.

Fourth, under present prison rules, once an inmate secures legal representation, either from private attorneys or from counsel appointed by courts or employed by available service organizations, the inmate may designate an attorney of record to whom unimpeded access by mail is allowed. Outgoing mail to a designated attorney or to a state or federal court is classified as privileged mail and not opened or otherwise interfered with. Further, inmates are not restricted in the number of letters which may be sent to their attorneys or to a court. Designated attorneys of record are also free to visit their inmate-clients during normal business hours, after notice to penitentiary officials is given.

Finally, it is the ordinary practice in this federal judicial district to appoint counsel for indigent inmates whose habeas corpus or civil rights claims proceed beyond the report and recommendations of the United States Magistrate.

While conceding the existence of these legal aids, plaintiffs dispute defendants' conclusion that, without more, they satisfy the inmates' constitutional right to access to the courts. In support of their

contention that staff legal counsel must also be provided the inmate population, plaintiffs have submitted data tending to show that the Parchman inmates are intellectually unable to utilize the law library materials which they first sought and have now been provided by court order. As a matter of fact, Parchman's brief experience with inmate use of a modern law library permits no firm conclusion as to the degree of its utility. Thus plaintiffs have adduced expert testimony seeking to establish certain working hypotheses. Although the submitted data is sophisticated and lengthy, it is sufficient for our purpose to note that the technical information was intended to establish—and did establish with reasonable certainty—two propositions: First, that reading materials commonly found in a law library make for tediously difficult reading, generally on a college or college graduate level;[3] second, that inmates at Parchman are so ill-educated that most prisoners would not be able to well comprehend and make intelligent use of the law library materials.[4]

■■■■ Against this factual background, our task is to define the precise scope of the constitutionally guaranteed right of penitentiary inmates to access to the courts, and then measure the Parchman system in accordance with that standard. We undertake this assignment fully cognizant that primary responsibility for handling offenders convicted of state crime in our federal system is lodged with state authorities, and not with the federal judiciary. When federal judges are required to intervene by invocation of their congressionally-mandated jurisdiction, they should act with appropriate circumspection, and only to the extent that the Constitution and laws of the United States permit no other course.

## II. THE LAW

■■■■ Implicit in our discussion is a recognition of what this case does *not* involve. It emphatically does not concern the well-delineated requirements of the Sixth Amendment concerning the right to counsel. The Sixth Amendment's guarantees of effective representation of counsel, fully applicable to Mississippi, apply, by the express terms of the Amendment, only to an accused faced with criminal prosecution.[5] For the present plaintiffs, criminal prosecution is at an end; and each Parchman in-

3. Through an expert in the field, plaintiffs subjected selected legal materials to readability analyses under two widely accepted readability studies, the Dale-Chall test and the Fry test. These tests consider variables such as sentence length and individual word difficulty and length and, through complex formulae, assign to tested reading materials a grade placement equivalent, which purports to correlate a given reading sample to the academic grade level at which the sample can be read with understanding by a hypothetical average individual. Of the 9 selections from legal materials tested, all 9 were found to be of college or college graduate level difficulty under the Fry test, while the Dale-Chall formula rated 8 of the 9 at the college or college graduate level.

4. The educational data presented is derived largely from the 1970 census, a study conducted at Delta State University, and A Master Plan for Corrections in Mississippi. A study of it reveals that although the median grade level achieved by all American males over 25 years of age is 12.1, in Mis-

sissippi the figure is 10.4 for all races and 6.5 for blacks. Further, while the median grade level completed by inmates over 25 in all American institutions is 9.7, in Mississippi the figures are 8.8 for whites and 4.5 for blacks. The data also shows that 88.2% of all Mississippi State Penitentiary inmates have not finished high school, and 56.3% have less than a 9th grade education. Only 5.4% of all male inmates in the United States have completed at least one year of higher education, the minimum grade level at which comprehension of legal materials may be ordinarily expected to occur. Although no comparable figures for Mississippi were presented to the court, it seems inevitable that the percentage of college-trained men at Parchman is even lower. Further, two-thirds of Parchman's population is black; approximately 50 inmates are female.

5. The Amendment provides, in relevant part: "In all criminal prosecutions the accused shall . . . have the Assistance of Counsel for his defense."

mate has, at least presumptively, already received the benefits of his Sixth Amendment rights before and at trial and on appeal. If those rights were denied any member of the plaintiff class, they may be speedily asserted through post-conviction proceedings available in the state and federal courts of Mississippi. Once criminal culpability is finally established and sentence imposed, however, the Sixth Amendment has no further role to play. Thus, it is not required that the state provide an attorney to represent every inmate who may wish to challenge the constitutionality of his conviction through habeas corpus, or to prosecute claims arising from the conditions of his incarceration. Such litigation being civil in nature, the right to counsel does not inhere in the Sixth Amendment.

The less demanding constitutional guarantees of legal representation extended to a person convicted of transgression against the criminal laws of our society recognize, not that the rights of the convicted offender are of less importance than those of the accused, but that the extraordinary threat to those rights which is posed by a pending criminal prosecution no longer exists. Once imprisonment pursuant to final judgment of conviction has begun, different constitutional protections commensurate with the nature of the interests at stake must govern. In the case sub judice, the applicable standard is that of proper inmate access to the courts.

The right of convicted offenders to access to state and federal courts has long been recognized as one of constitutional dimension,[6] and it is firmly established that prisoner access to the courts is assured, as a fundamental corollary of Fourteenth Amendment due process, in all claims seeking vindication of federally protected rights. Thus, inmate claims arising under 42 U.S.C. § 1983 are as fully deserving of judicial consideration as are petitions for post-conviction relief, such as state or federal habeas corpus or error coram nobis. Procunier v. Martinez, 416 U.S. 396, 419, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); Nolan v. Scafati, 430 F.2d 548 (1 Cir. 1970); Cross v. Powers, 328 F.Supp. 899, 901–02 (W.D.Wis.1971). We are constrained to observe, however, that determining what is meant by "access to the courts" has proved more difficult than defining the nature of the right as a concept of constitutional law. The clear teaching is that the state may not place in the way of the putative inmate-plaintiff physical impediments which may effectively prevent communication with the judiciary. Thus, the Supreme Court has struck down state regulations which require the prior approval by prison officials of petitions for habeas corpus,[7] which require the payment of a filing fee for habeas petitions,[8] and which refuse to make available to indigent prisoners trial transcripts necessary to post-conviction relief. Long v. District Court of Iowa, 385 U.S. 192, 87 S. Ct. 362, 17 L.Ed.2d 290 (1966); Lane v. Brown, 372 U.S. 477, 83 S.Ct. 768, 9 L. Ed.2d 892 (1963). But more is required than an absence of governmental interference with individual prisoner communications.

Acknowledging that "penitentiaries include among their inmates a high percentage of persons who are totally or functionally illiterate, whose education attainments are slight, and whose intelligence is limited," the Supreme Court in Johnson v. Avery, 393 U.S. 483, 487, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969), invalidated a prison regulation which barred inmates from assisting fellow inmates in writwriting. *Johnson* thus introduced a requirement of *reasonably adequate* access and placed on the state an affirmative obligation to provide ignorant prisoners with the means of intelligible communication to the judiciary to insure a

---

6. Ex parte Hull, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941).

7. Id.

8. Smith v. Bennett, 365 U.S. 708, 81 S.Ct. 895, 6 L.Ed.2d 39 (1961).

fair hearing for their claims. The post-*Johnson* cases have uniformly recognized that irremediable ignorance forms a barrier to effective presentation of inmate legal claims quite as real as did the more blatant physical impediments of the past. See, e.g. Adams v. Carlson, 488 F.2d 619 (7 Cir. 1973); United States v. Simpson, 141 U.S. App.D.C. 8, 436 F.2d 162 (1970); Wainwright v. Coonts, 409 F.2d 1337 (5 Cir. 1969).

■ We therefore conclude that the right of court access requires that the State provide *some source* of assistance for literate and illiterate inmates alike, tailored to their differing needs and abilities, which is designed to and does make realistically possible their purposeful communication with the courts.

■ The nature and extent of this assistance has often been addressed, commonly in the context of prison regulations which, although not physical impediments to court access, do nonetheless prohibit inmate writwriting assistance or inmate access to legal materials. Plaintiffs urge primarily that such assistance include professional legal counsel, employed by the State, to act as attorneys for their inmate clients. With one possible exception,[9] however, no court has ever held that, as a constitutional absolute, a state must provide legal counsel for inmates on the institutionalized basis now demanded by plaintiffs.

Instead, the clear assumption has been that legal counsel is not a constitutional necessity, so long as the state fulfills its obligations by the establishment of reasonable alternative measures of assistance. See, e.g., *Johnson*, supra, 393 U.S., at 488–90, 89 S.Ct. 747; Gilmore v. Lynch, 319 F.Supp. 105 (N.D.Cal.1970) (three-judge court), aff'd mem. sub. nom., Younger v. Gilmore, 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971); Novak v. Beto, 453 F.2d 661, 664 (5 Cir. 1971); Williams v. United States Dept. of Justice, Bureau of Prisons, 433 F.2d 958, 959 (5 Cir. 1970); Wainwright v. Coonts, supra; Battle v. Anderson, 376 F.Supp. 402, 426–27 (E.D.Okl.1974); United States ex rel. Russell v. Hendrick, 376 F.Supp. 158 (E.D.Pa.1974); United States ex rel. Stevenson v. Mancusi, 325 F.Supp. 1028 (W.D.N.Y.1971). Further, even in those cases in which prison legal services have failed constitutional muster, courts have been reluctant to impose specific programs, aware that though access to the courts is a federal imperative, choice of the manner in which the constitutional minimum is assured is essentially a state function. See, e.g., *Gilmore*, supra, 319 F.Supp. at 112; *Battle*, supra, 376 F.Supp. 427; Silo v. Commis-

---

9. See Hooks v. Wainwright, 352 F.Supp. 163 (M.D.Fla.1972). Although plaintiffs lean heavily on *Hooks*, the precise holding of that case is not easy to catalogue. The *Hooks* court began by posing the key issue to its decision in alternative language:

"Does the state have affirmative federal constitutional duty to furnish prison inmates with expensive law libraries *or* to provide inmates with professional or quasi-professional legal assistance?" Id. at 165.

After examining Florida's program of legal services, Judge Scott concluded that it failed to assure inmates access to the courts and, to the extent that affluent prisoners could press their claims through retained counsel while indigent inmates had neither attorneys nor an adequate law library, the State was denying to such indigents equal protection. Based on that finding, the court went on to mandate a remedy encompassing both an improved law library and professional legal counsel.

We decline to follow *Hooks* to the extent that it may be read as requiring both counsel and a full and complete law library. The opinion of the Court failed to discuss whether other mechanisms for inmate assistance were provided by Florida. With deference, we must reject any view that under the Equal Protection Clause an adequate legal services program is not possible without state-furnished attorneys. In our view, once a constitutionally acceptable program is established which satisfies the Due Process Clause, the state is not guilty of an equal protection transgression merely because one inmate, possessed of ample private resources, is able to retain the services of a practicing attorney while another, the impecunious inmate, must rely on his own or a writwriter's talents.

sioner of Pa. Bureau of Correction, 380 F.Supp. 1340 (M.D.Pa.1974).

State-supplied legal counsel would, of course, be of material benefit to any modern correctional facility and of even greater help to the courts, as plaintiffs and amicus have so cogently demonstrated. But we must recognize, with Justice Harlan, that our Constitution does not require all that is or may be deemed socially desirable. Reynolds v. Sims, 377 U.S. 533, 624–25, 84 S.Ct. 1362, 12 L. Ed.2d 506 (1964) (Harlan, J., dissenting). Neither, as the Supreme Court has recently held, must penitentiary administrators "adopt every proposal that may be thought to facilitate prisoner access to the courts." Procunier v. Martinez, supra, 416 U.S. at 420, 94 S.Ct. at 1815. Opposing interests founded upon legitimate goals of prison administration as well as official expertise and discretion of penal authorities must also be weighed. Alternative programs may be adopted which, without legal counsel, permit prisoners to seek out necessary assistance in the drafting of their various legal documents and under which effective access to the courts is possible.

■ Acceptable legal services programs may vary widely in their format, as do the demographics of penal institutions. But to a greater or lesser degree, dependent upon the circumstances of a particular penitentiary setting, all permissible programs must affirmatively include at least these aspects. First, some source of legal learning of a professional nature must be made available to all inmates for full legal development of their claims. Such a source may consist of an adequate law library or of qualified attorneys in sufficient number; again, some combination of books and attorneys may suffice. Secondly, for those inmates who possess intellectual or educational attainments insufficient to permit study and reasonable comprehension of their legal claims, provision must be made to allow them to communicate with someone who, after consultation with the legal learning source, is capable of translating their complaints into an understandable presentation. Such a presentation need not approximate the work product of a licensed attorney; it need only be a reasonable, straightforward and intelligible statement. The scrivener for the unlearned inmate may be an institutional attorney, a free-world person with paralegal training, or an inmate who through experience and native intelligence has emerged as a competent writwriter. Where these sources of assistance prevail, and no physical or coercive restraints to prisoner complaints exist, we hold that due process mandating access to the courts is met.

Against this standard we measure the existing Parchman system and consider plaintiffs' assertions that the low educational level of Parchman inmates and the geographical conditions of the institution render valueless the law library so recently established. We note first that no evidence has been presented that Parchman is devoid of competent writwriters. To the contrary, this court knows from its records and files that writs are received on almost a daily basis. There is no evidence that the Parchman law library is shunned or not used by the inmate population. That most inmates may not be able writwriters and cannot, owing to their educational deprivation, utilize the law library effectively is surely not a situation unique to Parchman, nor one which requires eschewing all law book assistance in favor of legal counsel. See *Johnson*, supra, 393 U.S. at 487, 89 S.Ct. 747. At Parchman, as at other penal institutions, writwriters can and do assist other inmates in the prosecution of their claims and in attendant legal research. The existence of this functionally literate minority, able to understand the comprehensive legal materials at their disposal, justifies and makes valuable a prison law library to the entire inmate population.

■ Plaintiffs further contend that the widely scattered Parchman residential camps, when coupled with the administrative prohibition against inter-camp visits by writwriters, operate as a

de facto bar to inmates obtaining competent writwriter assistance and thus necessitate state-furnished legal counsel. Indisputably, Parchman's unusual physical conditions (more than 20 residential camps widely separated over 26,000 acres of land) require procedures which differ somewhat from corrections practices obtaining at a walled prison or one of close quarters.[10] We share plaintiffs' concern that one or more of the residential camps might, at some point, be without a resident possessing writwriting skills to serve the functionally illiterate. We cannot, however, respond to this potential danger in the wholesale manner suggested by plaintiffs, where acceptable and less stringent or costly alternatives are readily available to remedy the problem, should it arise. It will suffice, therefore, to charge the defendants with the responsibility of formulating a plan, compatible with security objectives, which will insure that inmates needing such assistance will have access to a competent writwriter. Such a plan, of course, must in some way provide for identification of writwriters; it must also create a method whereby the inmate-plaintiff and the writwriter can meet together, possibly at a central location such as the law library or elsewhere for consultation. Although one acceptable solution might be to permit properly regulated inter-camp travel by a competent writwriter, whether an inmate or not, for assistance, there are surely other methods of equal or greater effectiveness. The Parchman administration, which has primary responsibility in such matters, is competent to develop a proper plan of inmate communication to the courts and we charge the defendants with that duty.

With this single modification, the legal services now provided at Parchman meet fully the standards of the Due Process Clause for assuring reasonable access to the courts for all inmates.

Let an order be entered accordingly.

## APPENDIX A

## RULES GOVERNING THE OPERATION OF THE LAW LIBRARY

I. ELIGIBILITY

    A. All inmates in the regular inmate population are eligible for the use of the Law Library facilities and materials.

    B. Those inmates housed in the Maximum Security Unit may request materials from the Law Library by using the Law Library Request form.

    C. The Law Library is available for legal work only and is not to be utilized for typing school work and other nonlegal work.

II. ACCESS

    A. All inmates will be allowed to have a reasonable amount of time to prepare their legal documents. Therefore, inmates may attend the Law Library as often as they desire providing space is available.

    B. The spaces will be fairly allocated by the library staff to those requesting them.

    C. Inmates may leave the Law Library to use the restroom but may not loiter.

    D. Access to the Law Library shall be by Staff permission only. Inmates who desire to use the Law Library must send a Law Library Request form to the Library Staff, and the staff will make

---

10. See, e. g., Lockart v. Hollowell, GC 73–70–K (N.D.Miss. Nov. 27, 1974), in which a penitentiary regulation prohibiting inmate travel between residential camps was upheld in the face of claims that the regulation impinged upon the inmate's free exercise of religion, where alternate means were provided for worship services. Also in Gates v. Collier, 390 F.Supp. 482 (1975), this court recently approved prison mail regulations permitting opening of certain classes of incoming inmate mail at a central location out of the presence of the inmate-addressee, due to the impracticability of mail inspection at each of the individual residential camps.

transfers to be signed by the Superintendent or the Assistant Superintendent.

E. In the event of an emergency situation, such as a court deadline, extra time may be granted to individual inmates.

F. The working spaces are limited to twelve, so the number assigned to the Law Library at one time is limited to this number.

## III. ASSISTANCE

A. The library staff are available for advise and assistance in *researching* legal subject.

B. The library staff are not writ-writers or typists. They do not claim the expertise nor bear the responsibility of lawyers.

C. Inmates may advise and assist each other in legal matters, but a fee may *not* be charged for such assistance. Those inmates who assist other inmates are *not* sanctioned by this institution to advise on legal questions.

D. Inmates will be assigned to the Law Library as librarians. They will be charged with keeping the books in order, dispensing paper and printed forms, assisting inmates in finding information in the law books, and in general keeping the Law Library materials in an orderly manner. These inmates are not clerk typists or writ-typists and are *not* required to do typing for other inmates. They are *not* sanctioned by this institution to carry on legal correspondence *for* other inmates or to be the official writ writers.

## IV. BOOKS AND LEGAL MATERIALS

A. All legal material housed in this facility are for the use of all inmates and may not be checked out.

B. Inmates may own, possess and have in their resident camps legal papers and materials. All such papers and materials will *not* be housed in the Law Library. Legal work may also be done in the resident camps and inmates may work on other inmate's legal work. The safekeeping of such will be the individual inmate's responsibility and not that of Law Library personnel.

C. Typing and securing additional copies of papers is the responsibility of each inmate.

D. The Library will furnish such materials as are reasonably necessary for the preparation of legal papers. These materials are to be furnished to inmates who are doing legal work and are not to be given out to everyone who requests materials.

## V. CONDUCT

A. Inmates using the Law Library are subject to all rules of this institution. Infractions of rules governing the Law Library will be subject to disciplinary action.

## VI. LIBRARY HOURS

|  | | Afternoon | Night |
|---|---|---|---|
| A. | Monday | 12:00–4:00 P.M. | 4:30–8:00 P.M. |
|  | Tuesday | 12:00–4:00 P.M. | 4:30–8:00 P.M. |
|  | Wednesday | 12:00–4:00 P.M. | 4:30–8:00 P.M. |
|  | Thursday | 12:00–4:00 P.M. | 4:30–8:00 P.M. |
|  | Friday | 12:00–4:00 P.M. | 4:30–8:00 P.M. |

B. For quickest access to Law Library

(1) Work and School Camps should apply for admission (on Law Library Request Form) during night hours.

(2) Non-work Camps should apply for admission (On Law Library Request Form) during afternoon hours.

*All staff members are encouraged to use the Law Library during regular Library hours.