**JOHN L., Individually and On Behalf of All Other Persons Similarly Situated, by His Next Friend David Kozlowski, Plaintiffs–Appellees,**

v.

**Betty ADAMS, Commissioner of the Department of Youth Development, Defendant–Appellant.**

No. 91–6241.

United States Court of Appeals, Sixth Circuit.

Argued March 16, 1992.

Decided July 17, 1992.

Rehearing Denied Sept. 22, 1992.

David A. Kozlowski (argued), Legal Services of S. Central, Tennessee, Columbia, Tenn., Susan L. Kay (briefed), Vanderbilt Legal Clinic, Nashville, Tenn., for plaintiffs-appellees.

Kimberly J. Dean, Asst. Atty. Gen. (argued and briefed), Mary G. Moody, Charles W. Burson, Atty. Gen., Office of Atty. Gen. of Tenn., Nashville, Tenn., for defendant-appellant.

Before: BATCHELDER, Circuit Judge, LIVELY, Senior Circuit Judge, and TAYLOR, District Judge.*

BATCHELDER, Circuit Judge.

 This case presents important questions about the existence and scope of the constitutional right of access to the courts in the context of incarcerated juveniles. For the reasons which follow, we hold that incarcerated juveniles do have a constitutional right of access to the courts, and that in order to make this right meaningful the State must provide the juveniles with access to an attorney. We hold, however, that there are limitations on the types of matters on which the State may be compelled to provide attorney assistance.

## I. Factual and Procedural Background

The district court set forth in detail the facts of this case in its initial opinion. *John L. v. Adams*, 750 F.Supp. 288. (M.D.Tenn.1990).[1] Thus, our discussion of the facts will be brief.

On November 7, 1988, plaintiff John L., by his next friend Andrew Shookhoff, filed this Section 1983 action claiming that he was being denied the right of access to the courts. When this suit was filed, plaintiff was 17 years old and was incarcerated in the Taft Youth Center in Pikeville, Tennessee, one of the State's secure juvenile institutions. Plaintiff sought, and was granted, class certification in June 1989. Therefore, plaintiffs are the class consisting of persons who are confined or will be confined in the secure institutions operated by the Tennessee Department of Youth Development (the "Department"). 750 F.Supp. at 289.

Betty Adams was named the defendant in her official capacity as the Commissioner of the Tennessee Department of Youth Development. As a result, we will refer to the defendant as the "State". The State operates four secure juvenile institutions, or "Youth Centers": Wilder, Woodland Hills, Taft, and Mountain View. Two of these institutions are new, and at the time of the district court's first opinion all were in the process of gaining accreditation by the American Corrections Association. As of early 1991, there were just over 500 youths in these institutions, and it is the Tennessee legislature's intent for these facilities to have a maximum total population of 588 youths.

Plaintiffs moved for summary judgment on liability, and on February 28, 1990, the district court granted plaintiffs' motion, holding that (1) juveniles incarcerated in secure facilities have a constitutional right of access to the courts, and (2) the defendant has failed to provide the plaintiffs with adequate, effective and meaningful access to the courts. At the request of the State, the district court permitted the State to submit a proposed remedial plan. The question of an appropriate remedy was briefed by the parties, and the district court held an evidentiary hearing, after which more briefs were submitted. The district court then entered its remedial order.

Under the court's remedial order, which incorporated substantial portions of the State's proposed plan, the Department will let four separate contracts to have private attorneys provide part-time legal assistance to juveniles at the four secure institutions. The billing rate on the contracts is currently capped at $75 per hour. The contract attorney or attorneys at each institution will be permitted to bill the state for up to eight hours per week for their work with the juveniles.[2] The contract attorneys' function is to speak with juveniles who request to talk with an attorney, to perform the factual and legal research necessary to comply with Rule 11, and either to advise the juvenile that he or she does not have a meritorious claim or to prepare appropriate pleadings to be filed *pro se* with a motion for appointment of counsel. The

---

* The Honorable Anna Diggs Taylor, United States District Judge for the Eastern District of Michigan, sitting by designation.

1. The parties consented to the case's being heard by a Magistrate–Judge.

2. Regardless of the number of attorneys the State contracts with for each juvenile institution, the total number of hours per week for which the State will contract is eight.

attorneys are instructed to "urge use of the grievance procedures established at each institution to solve any and all claims," but use of those procedures is not a requirement.

Under the district court's remedial order, the issues that the contract attorneys may pursue are: (1) fact or duration of confinement and conditions of confinement (i.e. commitment appeals, post-commitment petitions, habeas corpus petitions, and civil rights complaints); (2) any Eighth Amendment claim whether based on deliberate indifference to serious medical needs or based upon cruel and unusual punishment arising from maltreatment by officers; (3) unconstitutional conditions of confinement of any nature; (4) any due process claim; (5) any equal protection claim; (6) Departmental transfers if it is determined in an appropriate case that the State statute·or policies create a liberty interest; (7) any other claim which could be the basis for a civil action pursuant to 42 U.S.C. § 1983; and (8) any claim involving the treatment program and education issues.

On October 18, 1991, the State filed a timely notice of appeal. The appeal encompassed both the district court's finding of liability and its remedial order. On appeal, the State argues that the plaintiffs have no constitutional right of access to courts, and even if they do, the district court's remedial order is broader than the scope of that right.

## II. The Constitutional Right of Access to Courts

### A. The Contentions of the Parties

In the district court, plaintiffs argued that as incarcerated individuals they have a right of access to the courts. The district court agreed. After discussing cases in which the Supreme Court recognized the serious consequences of juvenile incarceration, the district court stated, "The same concern for the seriousness of juvenile detention which requires the recognition that juveniles have constitutional rights to procedural protections at juvenile commitment hearings motivates this Court to recognize that incarcerated juveniles have a right of access to the courts comparable to incarcerated adults." 750 F.Supp. at 291.

On appeal, the State contends that the district court erred in recognizing such a right in juveniles. The State supports this argument by citing certain differences in the way in which adults and juveniles are treated under Tennessee law. The great majority of these differences are not material, however, since it is the fact of incarceration which is the most significant similarity that the plaintiffs share with incarcerated adults. As the following discussion of relevant case law demonstrates, it is simply too late in the day for the State's argument to prevail.

### B. Sources of the Constitutional Right of Access

On numerous occasions the Supreme Court has recognized the existence of a constitutional right of access to the courts. On several occasions, the Court has identified the source of the right of access in the prisoner context as the Due Process Clause. *Ex parte Hull,* 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941); *Johnson v. Avery,* 393 U.S. 483, 490, 89 S.Ct. 747, 751, 21 L.Ed.2d 718 (1969); *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). Recently, the Supreme Court has noted that the right of access to the courts is also rooted in part in the Equal Protection Clause. *Murray v. Giarratano,* 492 U.S. 1, 109 S.Ct. 2765, 2771 n. 6, 106 L.Ed.2d 1 (1989).

Outside the prisoner context, the Court has found support for the right of access in the Privileges and Immunities Clause of Article IV, *Chambers v. Baltimore & Ohio R.R. Co.,* 207 U.S. 142, 147, 28 S.Ct. 34, 35, 52 L.Ed. 143 (1907); *see also Smith v. Maschner,* 899 F.2d 940, 947 (10th Cir. 1990), as well as in due process of law, *Boddie v. Connecticut,* 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971). The Supreme Court has also held, "The right of access to the courts is but one aspect of the right of petition [of the First Amendment]." *California Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 510, 92

S.Ct. 609, 612, 30 L.Ed.2d 642 (1972). In *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), the Court tied this First Amendment right of access to the prisoner context. The Court stated, "Like others, prisoners have the constitutional right to petition the Government for redress of their grievances, which includes a reasonable right of access to the courts." *Id.* at 523, 104 S.Ct. at 3198 (citing *Johnson v. Avery*).

### C. Supreme Court Authority on the Right of Access in the Prisoner Context

The Supreme Court first discussed the right of access in the prisoner context more than fifty years ago. In *Ex parte Hull*, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941), the Court invalidated a prison regulation which required that all petitions for writ of habeas corpus be screened by the prison legal investigator before they could be sent to the court. The Court opined that the "state and its officers may not abridge or impair petitioner's right to apply to a federal court for a writ of habeas corpus." *Id.* at 549, 61 S.Ct. at 642. In *Johnson v. Avery*, 393 U.S. 483, 490, 89 S.Ct. 747, 751, 21 L.Ed.2d 718 (1969), the Court held that unless the state provides some reasonable alternative to assist inmates in the preparation of petitions for post-conviction relief, it may not validly enforce a regulation that bars inmates from furnishing such assistance to other prisoners. The Court in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), further defined the right of access. "The right of access to the courts, upon which *Avery* was premised, is founded in the Due Process Clause and assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights." 418 U.S. at 579, 94 S.Ct. at 2986. Thus, the Court held that the right of access to courts extended beyond habeas corpus petitions to civil rights actions.

Perhaps the Supreme Court's most complete explanation of the right of access to the courts is found in *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). In *Bounds*, the Court held that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Id.* at 828, 97 S.Ct. at 1498 (footnote omitted). The Court stated that states must "shoulder affirmative obligations to assure all prisoners [adequate, effective, and] meaningful access to the courts," *id.* at 822, 824, 97 S.Ct. at 1495, 1496. The particular method of ensuring such access may be left to the state, but some of the options noted by the Court are establishing and providing access to a law library, hiring lawyers on a full- or part-time basis, and using paraprofessionals, law students, or volunteers from the legal community to advise prisoners, or combinations of these programs. *Id.* at 831–32 & n. 20, 97 S.Ct. at 1499–1500 & n. 20. The Court in *Bounds* also reiterated its holding in *Wolff v. McDonnell* that the right of access extends to civil rights actions. *Id.* at 823, 97 S.Ct. at 1495.

### D. Cases Discussing Incarcerated Juveniles' Right of Access

Only two federal cases have addressed the question of juveniles' rights of access to courts. A federal district court in Mississippi addressing the conditions of confinement in a juvenile institution has held that the constitutional right of access to the courts applied to juveniles who had been committed to state "training" schools. *Morgan v. Sproat*, 432 F.Supp. 1130 (S.D.Miss.1977). With respect to the right of access, the court perceived no distinction between incarcerated adults and incarcerated juveniles. *Id.* at 1158; *see Application of Gault*, 387 U.S. 1, 12–14, 87 S.Ct. 1428, 1436, 18 L.Ed.2d 527 (1967).[3]

---

**3.** In *Gault*, the Supreme Court held that due process applies to juvenile proceedings. The Court recognized, however, that the content of "due process" may vary because of the differences between adults and juveniles. *Id.* at 14–31, 87 S.Ct. at 1436–1445.

The court in *Morgan* also correctly understood what the Supreme Court's decision in *Bounds* made unmistakably clear just ten days after the district court's opinion was released, that the right of access not only prohibits the State from interfering with incarcerated individuals' access to the courts, it means that the State must take affirmative steps "to enable prisoners to place their grievances before the judicial system." 432 F.Supp. at 1157. In so holding, the court relied on *Johnson v. Avery,* and other federal decisions that followed it.

The First Circuit has recognized a right of access to courts for incarcerated juveniles, although in a context differing from that in *Morgan* and the present case. In *Germany v. Vance,* 868 F.2d 9 (1st Cir. 1989), plaintiff had been adjudicated a delinquent for an alleged assault on her father. Eventually, plaintiff was committed to the custody of the Massachusetts Department of Youth Services ("Department"). While plaintiff was in Department custody, plaintiff's mother told one of plaintiff's caseworkers, defendant Carol Vance, that the assault for which plaintiff had been incarcerated had been fabricated by plaintiff's father. *Id.* at 12. The father was present when this statement was made, and he did not deny it. *Id.* Vance submitted a report on her conversation with plaintiff's parents to her supervisor, defendant John Paladino. Neither Vance nor Paladino told plaintiff about the statements. *Id.* About three months later, when plaintiff's case was transferred to another caseworker, plaintiff was told of the statement. *Id.* at 13. Plaintiff was not released from Department custody until over a year later. *Id.*

Plaintiff brought a Section 1983 suit against the caseworkers and supervisors. In reviewing the district court's grant of summary judgment for plaintiff against

Vance and Paladino, the court of appeals stated,

> As already suggested, plaintiff's status as a juvenile offers no excuse. Defendants contend that "the Constitutional requirements of *Bounds* have never been applied to juvenile correctional systems." We reject any implication that the constitutional right of access to the courts does not apply to juveniles in [Department of Youth Services] custody. The Supreme Court has recognized the due process rights of minors in the adjudicatory stage of the juvenile process. *In re Gault,* 387 U.S. 1, 12–14, 87 S.Ct. 1428, 1436 [18 L.Ed.2d 527] (1967). *See Schall v. Martin,* 467 U.S. 253, 263, 104 S.Ct. 2403, 2409, 81 L.Ed.2d 207 (1984) (reviewing the basic constitutional protections that apply to juveniles accused of crimes).

868 F.2d at 16. The court recognized that the stigma of being found to have violated the law and the resulting incarceration are the key similarities between juveniles and adults that make it logical for juveniles to be entitled to the right of access to courts. *Id.* at 16.

E. Conclusion

Like the courts in *Morgan* and *Germany,* we see no logical reason why the right of access should not be applied to incarcerated juveniles. We therefore hold that plaintiffs, as incarcerated juveniles, have a constitutional right of access to the courts.[4]

III. The Scope of the Right of Access

▮ Prison officials must assure that inmate access to the courts is "adequate, effective and meaningful." *Bounds v. Smith,* 430 U.S. 817, 822, 97 S.Ct. 1491, 1495, 52 L.Ed.2d 72 (1977); *Patterson v. Mintzes,* 717 F.2d 284, 288 (6th Cir.1983). What constitutes meaningful access will vary with the circumstances, and officials are permitted some discretion in determin-

---

**4.** We find additional support for this conclusion in decisions holding that the right of access applies to other groups who are in the custody of the State. These groups include persons serving brief sentences in local jails, *Morrow v. Harwell,* 768 F.2d 619 (5th Cir.1985); *Leeds v. Watson,* 630 F.2d 674 (9th Cir.1980); pretrial detainees, *Matzker v. Herr,* 748 F.2d 1142 (7th Cir.1984); *see also Penland v. Warren County Jail,* 797 F.2d 332, 335 (6th Cir.1986) (Jones, J., concurring); and mental patients under commitment, *Ward v. Kort,* 762 F.2d 856 (10th Cir. 1985); *Johnson v. Brelje,* 701 F.2d 1201 (7th Cir.1983).

ing how the right will be administered. *Bounds*, 430 U.S. at 830–31, 97 S.Ct. at 1499. In the present case, the State concedes that in order for these juvenile plaintiffs to have meaningful access to the courts, they must be afforded access to an attorney. We agree that merely providing plaintiffs with access to a law library, for example, would fail to assure meaningful access. The court in *Morgan* noted that the remedy for a constitutional deficiency in access could not be the same for juveniles as it is for adult prisoners. Although there was no law library at the "training schools" in *Morgan*, the court stated that

> even if there were, without assistance the students could not make effective use of legal materials. Furthermore, the students' ages, their lack of experience with the criminal system, and their relatively short confinement means that there cannot be a system of writ writers for students who need them.[5]

432 F.Supp. at 1158. In addition, numerous other cases provide authority for requiring access to counsel as opposed to merely providing access to a law library.[6] Thus, we affirm the portion of the district court's remedial order that requires the State to provide the plaintiffs with access to an attorney.

■ The district court's remedial order provides that the contract attorney may consult with the juvenile detainees about various matters including appeals, post-conviction relief including petitions for habeas corpus, conditions of confinement that rise to the level of a violation of statutory or constitutional law cognizable under 42 U.S.C. § 1983, and treatment and education matters. The parties do not agree on the range of legal issues upon which the attorney may consult with the juveniles and be compensated by the State. The State implicitly contends that the right of access does not extend to Section 1983 actions that do not involve constitutional rights, and therefore, it cannot be required to compensate the contract attorneys for their work on such matters. We summarily reject this argument, since neither *Bounds* nor any other Supreme Court case contains such a limitation. However, since we read *Bounds* as extending the right of access only to civil rights actions that are related to prisoners' incarceration, *see* 430 U.S. at 823, 97 S.Ct. at 1495, we hold that to be consistent with *Bounds*, the district court may require the State to reimburse the contract attorneys for work connected with Section 1983 actions only to the extent that they are related to the juveniles' incarceration.

■ The parties also disagree about whether it is appropriate for the remedial order to require access to an attorney for treatment and education issues. Since most education and treatment issues will

---

**5.** The court also noted that other potential remedies would be insufficient, in part, because many of the students were of lower mental ability. 432 F.Supp. at 1158 n. 60.

**6.** There is ample authority holding that at least for some classes of incarcerated individuals the State must provide more than access to a law library, for example, access to attorneys, in order to assure that access to the courts is meaningful. *Ward v. Kort*, 762 F.2d 856, 858 (10th Cir.1985) (committed mental patients); *Cruz v. Hauck*, 627 F.2d 710, 721 n. 21 (5th Cir.1980) (non-English speaking or illiterate inmates); *Hadix v. Johnson*, 694 F.Supp. 259, 288 (E.D.Mich.1988) (illiterate and segregated prisoners); *United States ex rel. Para–Professional Law Clinic v. Kane*, 656 F.Supp. 1099, 1105 (E.D.Pa.) (illiterate inmates and those in administrative or disciplinary custody), *aff'd without opinion*, 835 F.2d 285 (3d Cir.1987), *cert. denied*, 485 U.S. 993, 108 S.Ct. 1302, 99 L.Ed.2d 511 (1988); *Smith v. Bounds*, 610 F.Supp. 597 (E.D.N.C.1985) (illiterate inmates and those in administrative confinement), *subsequent order entered*, 657 F.Supp. 1322 (E.D.N.C.1986), *aff'd*, 813 F.2d 1299 (4th Cir.1987), *aff'd on reh'g*, 841 F.2d 77 (4th Cir.) (*en banc*), *cert. denied*, 488 U.S. 869, 109 S.Ct. 176, 102 L.Ed.2d 146 (1988); *Canterino v. Wilson*, 562 F.Supp. 106, 110 (W.D.Ky.1983) (low level of education among inmates was relevant factor in determining that state must provide more than law library to ensure meaningful access to the courts), *aff'd*, 875 F.2d 862 (6th Cir.) (table), *cert. denied*, 493 U.S. 991, 110 S.Ct. 539, 107 L.Ed.2d 536 (1989); *Glover v. Johnson*, 478 F.Supp. 1075 (E.D.Mich. 1979) (female prison where there were no writ writers); *Stevenson v. Reed*, 391 F.Supp. 1375, 1380–82 (N.D.Miss.1975) (illiterate inmates), *aff'd*, 530 F.2d 1207 (5th Cir.), *cert. denied*, 429 U.S. 944, 97 S.Ct. 365, 50 L.Ed.2d 315 (1976).

not be of a constitutional nature,[7] nor come under the aegis of Section 1983, the question is whether the State infringes plaintiffs' right of access if it does not affirmatively assist plaintiffs in filing actions to enforce these state law rights. We conclude that the State would not so infringe because it has no such duty.

■ We begin our discussion of the scope of the right of access with two propositions that we find to be well-established and firmly rooted in the language of the Supreme Court's opinions. First, as we have already noted, in order to assure that incarcerated persons have meaningful access to courts, states are required to provide affirmative assistance in the preparation of legal papers in cases involving constitutional rights and other civil rights actions related to their incarceration. *See Johnson v. Avery*, 393 U.S. 483, 490, 89 S.Ct. 747, 751, 21 L.Ed.2d 718 (1969); *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). This proposition is clearly set forth in these cases and requires no further discussion.

■ Second, in all other types of civil actions, states may not erect barriers that impede the right of access of incarcerated persons. This principle is illustrated by several cases. In *Corpus v. Estelle*, 551 F.2d 68, 70 (5th Cir.1977), the court held that the right of access extends to general civil matters. However, the court did so in the context of invalidating a prison rule that *"prohibit[ed]* prisoners from giving or receiving legal assistance in general civil legal matters." 551 F.2d at 70 (emphasis supplied). It did not require the prison to provide affirmative assistance on such matters, but rather struck down a barrier to such access.

Similarly, in *Jackson v. Procunier*, 789 F.2d 307, 310–11 (5th Cir.1986), the plain-

tiff, Andrew Jackson, alleged that prison mailroom personnel deliberately delayed his mail and that this resulted in the dismissal of his state court appeal in a civil lawsuit. In reversing the district court's dismissal of plaintiff's action, the Fifth Circuit reaffirmed its position that the right of access extends to general civil matters. In so ruling, the court held,

> If Jackson has alleged a deliberate *denial* of his right of access *to pursue* his civil appeal, he has alleged the deprivation of a substantive constitutional right found in the first amendment, as well as a potential deprivation of substantive and procedural due process.

789 F.2d at 311 (emphasis supplied). Thus, the court's holding rested on the alleged existence of a barrier that state officials had created, which caused interference with plaintiff's access to the state court system.

Finally, in *Straub v. Monge*, 815 F.2d 1467, 1470 (11th Cir.), *cert. denied*, 484 U.S. 946, 108 S.Ct. 336, 98 L.Ed.2d 363 (1987), the court of appeals relied on *Jackson* in striking down a prison rule that required inmates to obtain a court order before they could have access to a law library in order to pursue civil matters. In so holding, the court stated, "Regulations and practices that unjustifiably *obstruct* the availability of professional representation or other aspects of the right of access to the courts are invalid." *Id.* at 1469 (quoting *Procunier v. Martinez*, 416 U.S. 396, 419, 94 S.Ct. 1800, 1814, 40 L.Ed.2d 224 (1974)) (emphasis supplied).

In the present case, plaintiffs' position on appeal essentially asserts a third proposition—that states must provide affirmative assistance to incarcerated persons on civil matters arising under state law. This proposition is not well-grounded in the language of the Supreme Court's opinions or other case law, and we find it an unwar-

---

**7.** Whether the Tennessee statute cited by the district court that discusses the treatment and education purposes behind the juvenile incarceration system provides any entitlement to those measures such that failures in those areas constitute deprivations of a liberty interest under the Due Process Clause is not before us at

this time and, therefore, we have no occasion to address it. *See* 750 F.Supp. at 292 n. 9. We note, however, that the filing of such a claim is within the authority of the contract attorney. As we will discuss *infra*, a claim involving solely a violation of that state statute would not be within his or her authority.

ranted extension of the right of access. The Supreme Court's discussion in *Bounds* supports our view of the plaintiffs' assertion. In discussing the matters to which the right of access applies, the Court stated,

> [W]e are concerned in large part with original actions seeking new trials, release from confinement, or vindication of fundamental civil rights.... As this Court has "constantly emphasized," habeas corpus and civil rights actions are of "fundamental importance in our constitutional scheme" because they directly protect our most valued rights.

430 U.S. at 827, 97 S.Ct. at 1498 (ellipsis and citation omitted). Since *Bounds*, the Court has not expanded the scope of the right of access beyond this statement.

Our decision delineating this limitation on the right of access finds further support in the decisions of other courts of appeals. First, in *Ward v. Kort*, 762 F.2d 856 (10th Cir.1985), the court specifically ruled that prisoners' right of access that guarantees affirmative assistance from the state is limited to matters involving civil rights and habeas corpus complaints. *Id.* at 860–61. The *Ward* court noted the broader scope given to the right of access by the court in *Corpus v. Estelle*, but implicitly rejected that approach. *Id.* at 861 n. 3. As we have indicated, *Corpus* did not require affirmative assistance to prisoners on general civil matters, but rather struck down a regulation which had the effect of impeding access in such matters. Thus, we consider our holding to be consistent with both *Ward* and *Corpus*. In addition, courts have recognized that the right of access to courts is strongest in the context of constitutional claims and other civil rights actions, *Cofield v. Alabama Public Serv.*

*Comm'n*, 936 F.2d 512, 517 (11th Cir.1991); *In re Green*, 669 F.2d 779, 785 (D.C.Cir. 1981), but is considerably weaker in other types of legal actions. *Cofield*, 936 F.2d at 517; *see Green*, 669 F.2d at 785.

To support their position that the right to affirmative assistance of counsel extends to state law civil actions, plaintiffs cite *Taylor Drug Stores, Inc. v. Associated Dry Goods Corp.*, 560 F.2d 211 (6th Cir. 1977). In that case this Court stated,

> We find ourselves in agreement with the District Court that defendants-appellees' Jefferson County Circuit Court suit commenced in 1969 against plaintiff-appellant in this cause was not a sham. They had a constitutional right of access to the state courts to enforce a state law which had previously been upheld by the highest court of the state.... [The 1969 lawsuit] was concededly designed to eliminate Taylor Drug's Sunday competition. But such recourse to the courts to enforce a lawful statute was also within their rights under the First Amendment ...

560 F.2d at 213–14 (emphasis supplied).[8] This statement by the court identifies the First Amendment as the source of the right of access to which it refers.[9] It is not, however, directed toward the proposition for which plaintiffs cite it, *i.e.*, that prisoners' rights of access extend beyond constitutional and civil rights matters. Therefore, *Taylor* is inapposite.

The Supreme Court's decisions in the prisoner context do not extend the affirmative assistance aspect of the right of access to general civil matters arising solely out of state law. Although other courts of appeals have extended the right in the prisoner context to general civil law matters, they have not gone so far as to require

8. To support this conclusion, the court cited *Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). In a case decided before *Taylor Drug*, the Supreme Court included these same two cases in its discussion of the right of access to courts being grounded in part in the First Amendment. *California Motor Transp. Co.*

*v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609 (1972).

9. For Sixth Circuit cases discussing the right of access to courts in other contexts, see *Patterson v. Mintzes*, 717 F.2d 284 (6th Cir.1983), and *Penland v. Warren County Jail*, 759 F.2d 524 (6th Cir.1985) (*en banc*).

affirmative assistance by the state on such matters. Rather, those decisions are concerned with eliminating barriers to court access. We hold today that incarcerated juveniles do not have the right to affirmative legal assistance on treatment and education issues arising solely under Tennessee law.

It is important to recall that the touchstone of the right of access is meaningfulness. Nothing in our opinion limiting the remedial order to constitutional claims and other claims under Section 1983 that relate to plaintiffs' incarceration prevents the plaintiffs' access from being meaningful. In fact, were we to hold that the right of access extends to state law treatment and education issues, we see no logical end to the matters on which similarly situated groups of plaintiffs could demand access to an attorney. For example, while incarcerated juveniles have every right to go to court to be emancipated from their parents, and the institution in which they are kept may not erect barriers to those in its custody from proceeding in such matters, we believe that the federal courts have no business ordering the State to assist juveniles on such matters. Although actions for emancipation may be far removed in degree from the treatment and education issues at stake here, they are not different in kind; both are civil actions involving exclusively issues of state law.

Implicit in our analysis is the further conclusion that there is no right of access on petitions for post-commitment relief that arise purely under Tennessee law. *See* Tenn.Code Ann. §§ 37–1–302 to 322 (Michie 1991). It does not mean, however, that incarcerated juveniles do not have a right of access to counsel for an appeal of their adjudication of delinquency. Merely because juvenile adjudications in Tennessee are designated by state law as civil, as opposed to criminal, in nature, it is not the case that an appeal of a commitment order is a civil matter based purely on state law. First, by holding that jeopardy attaches in a juvenile adjudication, the Supreme Court has acknowledged that such proceedings are criminal in nature, regardless of how they are designated under state law. *Breed v. Jones*, 421 U.S. 519, 529, 95 S.Ct. 1779, 1785, 44 L.Ed.2d 346 (1975). In addition, there is an independent constitutional right to counsel for juvenile appeals that is grounded in the Sixth Amendment's right to counsel as applied to the states through the Fourteenth Amendment's Due Process Clause.[10]

IV. Disposition

For the reasons set forth above, we AFFIRM the district court's grant of summary judgment to the plaintiffs, but REVERSE its remedial order to the extent that it requires the State to provide assistance to juvenile detainees on Section 1983 claims unrelated to their detention and civil matters involving purely state law. The case is REMANDED for further proceedings in accordance with this Opinion.

---

**10.** At least one federal court of appeals has held that because *Gault* guarantees a juvenile the right to counsel during the delinquency adjudication stage, if the juvenile is entitled under the applicable state law to an appeal as of right from that adjudication, then he is also entitled to be represented by counsel on that first appeal. *United States v. M.I.M.*, 932 F.2d 1016, 1018 (1st Cir.1991) (citing *Penson v. United States*, 488 U.S. 75, 84–85, 109 S.Ct. 346, 352, 102 L.Ed.2d 300 (1988), and *Douglas v. California*, 372 U.S. 353, 355–56, 83 S.Ct. 814, 816, 9 L.Ed.2d 811 (1963)). In the present case, Tennessee provides for an appeal as of right from an adjudication of delinquency. Tenn.Code Ann. § 37–1–159 (Michie 1991); *see also Braziel v. State of Tennessee*, 529 S.W.2d 501, 508 (Tenn.Ct.Crim.App.1975). Thus, under the *M.I.M.* analysis, juveniles in Tennessee would be entitled to full representation on appeal from their adjudication of delinquency.